UNITED STATES of America,
Plaintiff-Appellee,

v.

Willard S. CARLOCK, Sr., Mitchell J. Scimemi, Willard S. Carlock, Jr., and Columbus J. Laird, Defendants-Appellants.

No. 85–4741.

United States Court of Appeals,
Fifth Circuit.

Dec. 9, 1986.

Oliver Schrumpf, Sulphur, La. (Court-appointed), for Carlock, Sr.

Alcide J. Gray, Lake Charles, La., for Scimemi.

John P. Navarre, Oakdale, La. (Court-appointed), for Laird.

Louis J. Cosenza, Leesville, La. (Court-appointed), for Carlock, Jr.

Sara Criscitelli, Washington, D.C., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., Larry J. Regan, Lake Charles, La., William S. Lynch, Peter C. Sprung, Crim. Div., Dept. of Justice, Washington, D.C., for the U.S.

Before CLARK, Chief Judge, WISDOM, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal attacks convictions of certain labor leaders and union members in a jury trial of a sixty count indictment charging violations of the Racketeering Influenced and Corrupt Organizations Act and the Taft-Hartley Act, extortion and obstruction of justice. We first describe generally the charged conduct and, after describing the indictment, we treat the specific attacks of each defendant. Finally, we affirm on all counts.

## I

By the government's evidence, during the 1970's Southwestern Louisiana was an area of labor unrest characterized by violence and corruption. Two outbreaks, known today as the Ellender Bridge and the Jupiter Chemical incidents, occurred within a nine-month span in 1975 and 1976, and contributed significantly to an atmosphere of violence and fear for union contractors and employees.[1] Willard S. Carlock, Sr., the business agent for the Lake Charles district office of Local 406 of the International Union of Operating Engineers, and others were indicted and tried in state court for their alleged role in the Ellender Bridge incident. They were acquitted, but ironically, these convictions had their genesis in those acquittals.

The government's overarching theory revolved around Carlock, Sr.'s abuse of his union office. As business agent for the district office of Local 406, Carlock, Sr., assigned work orders or referrals to union members and permit workers—operators of heavy construction equipment for construction sites. Appointed by the state business manager for Local 406, Carlock, Sr., was not subject to election or recall by the members of his local district. That is, he was not directly accountable to the local union members.

Columbus J. Laird was his assistant, and, like Carlock, Sr., could assign work orders or referrals. Willard S. Carlock, Jr., Mitchell J. Scimemi, and Michael Greer were often appointed by Carlock, Sr., and Laird

to be master mechanics[2] and thus positioned to affect work progress. All, the government says, were confederates of Carlock, Sr., in his corrupt work as the union business agent.

According to the government, Carlock, Sr., abused the office of business agent by accepting payments from local contractors employing members of Local 406 and by extorting payments from the contractors with threats of sabotage and general labor problems. He was also accused of extorting payments from local union workers by denying them job referrals if they failed to contribute to his defense fund, created to pay the debts generated by the state court trial.

### A. The Indictment

After two refusals by the United States Attorney's Office to pursue this case, a grand jury was convened in Lake Charles at the instigation of a United States Senate Subcommittee.[3] On January 17, 1985, the grand jury returned the following sixty count indictment.

Count 1 of the indictment charged Carlock, Sr., Laird, Carlock, Jr., Scimemi, Houston Byrd, Jr.,[4] Monroe Brabham, and Greer with conspiring to racketeer in violation of RICO, 18 U.S.C. § 1962(d), through their control of the affairs of Local 406. This count charged that Carlock, Sr., and Laird abused their positions as business agent and as assistant business agent, as follows: (1) by assigning jobs to ensure allegiance from union members; (2) by in-

---

1. By the government's evidence, Carlock, Sr., Scimemi, Garland Davidson, and other union members beat up non-union employees at Ellender Bridge, threw some off the bridge, and ran the rest off of the site because the contractor had decided to use non-union employees and to discontinue rental of a winch truck from Carlock, Sr. The government also alleged that Carlock, Sr., assisted by Carlock, Jr., and Scimemi, arranged for Local 406 members to picket the Jupiter Chemical site, at which Carlock, Sr. allegedly ordered a union member to drive a fork-lift through the gates. The picketing erupted in violence when someone drove a large fork-lift through Jupiter Chemical's gates, causing considerable damage and leading to gunfire.

2. As master mechanics, the men acted as job foremen on the construction site and controlled the work performed by Local 406 members.

3. The defendants challenged the actions of the Senate Subcommittee which investigated these racketeering affairs and asked that indictments be pursued. The defendant's arguments are vague and without force. We find no impropriety in the Subcommittee's actions. The decision to prosecute was made by the executive branch of government. That the legislative branch urged this action suggests nothing improper.

4. Byrd pled guilty and testified as a government witness.

stigating violent confrontation with local contractors, such as the Ellender Bridge and Jupiter Chemical incidents, so as to create a climate of violence and fear among union contractors and employees; (3) by demanding money from employers of Local 406 members in violation of the Taft-Hartley Act, 29 U.S.C. § 186; (4) by extorting the rental of unwanted and unnecessary equipment from Willard S. Carlock, Jr., Equipment Rentals, Inc., Cat-Low, Inc., Dana-K, Inc., and Tri-Coast, Inc., in violation of the Hobbs Act, 18 U.S.C. § 1951; (5) by making job assignments to ensure "kickbacks" from the individual members of Local 406 to Carlock, Sr.'s "defense fund"; and (6) by manipulating job assignments to exact sexual favors from female union members. Count 1 also charged Carlock, Jr., Scimemi, Byrd, Greer, and Brabham with abusing their power as appointed master mechanics by exacting kickbacks from union members, by assisting Carlock, Sr., in the extortion of equipment rentals from employers of Local 406 workers, and by demanding wage payments to Local 406 members for work not performed. Underlying this count were thirty-four charged racketeering acts. Count 2 charged the defendants with conducting and participating, directly and indirectly, in the affairs of Local 406 through a pattern of racketeering, consisting of the same thirty-four racketeering acts set forth in Count 1.

Count 3 charged Carlock, Sr., and Carlock, Jr., with investing income received through racketeering activity in enterprises, the activities of which affected interstate commerce, in violation of 18 U.S.C. § 1962(a). According to this count, Carlock, Sr., and Carlock, Jr., received equipment rental income from local contractors in violation of 29 U.S.C. § 186, and passed it to Willard S. Carlock, Jr., Equipment Rental, Inc. and Cat-Low. Four racketeering acts supported this count.

Counts 4–6 charged that Carlock, Sr., and Carlock, Jr., demanded and received equipment rentals from R.L. Abshire Construction, Inc., which employed members of Local 406, in violation of 29 U.S.C. § 186. Similarly, Counts 7–11 charged that Car-

lock, Sr., Carlock, Jr., and Brabham demanded and received equipment rentals from Pullman-Torkelson, Inc., which also employed members of Local 406.

Count 12 charged that Carlock, Sr., Carlock, Jr., and Brabham forced Pullman-Torkelson to pay for the repair of a bulldozer owned by Cat-Low in violation of 18 U.S.C. § 1951. According to this count, the confederates threatened Pullman-Torkelson with work slowdowns, stoppages, and physical harm unless Pullman-Torkelson repaired the bulldozer.

Counts 13–20 charged Carlock, Sr., and Scimemi with demanding and receiving equipment rentals from Union Engineering and Construction Co., which employed Local 406 members, in violation of 29 U.S.C. § 186. According to these counts, Carlock, Sr., and Scimemi forced Union Engineering to rent a 225 Cathoe from Dana-K. The separate counts are drawn from individual payments made by Union Engineering to Dana-K.

Count 21 charged Carlock, Sr., with extortion of DuPont & Associates. According to this count, Carlock, Sr., threatened DuPont with work slowdowns, stoppages, and physical harm unless it paid him approximately $2000. Similarly, Counts 22–27 charged Carlock, Sr., with extorting equipment rentals from DuPont on behalf of Dana-K. Each count charged a separate payment by DuPont to Dana-K. Count 28 charged Carlock, Sr., with demanding and receiving a cash payment from DuPont in violation of 29 U.S.C. § 186.

Count 29 charged Carlock, Sr., Scimemi, and Laird with extorting the rental of Scimemi's truck by Mar-Len of Louisiana, Inc., in violation of 18 U.S.C. § 1951. Similarly, Counts 30–34 charged these three men with extorting payments from Mar-Len for the road-boring services of CAFI. Each count is drawn from a separate payment by Mar-Len to CAFI.

Counts 35–41 charged Carlock, Sr., and Scimemi with extorting equipment rentals by Mar-Len on behalf of Tri-Coast by threatening work slowdowns, stoppages,

and physical harm in violation of 18 U.S.C. § 1951. Each count is drawn from a separate payment by Mar-Len to Tri-Coast.

Count 42 charged Carlock, Sr., with demanding and receiving items of value from Dunham-Price, Inc., in violation of 29 U.S.C. § 186. According to this count, Carlock, Sr., demanded and received three diesel engines from Ray Campbell of Dunham-Price. Similarly, Counts 43–55 charged Carlock Sr., with demanding and receiving payments from Tri-Coast.

Count 56 alleged that Carlock, Sr., and Carlock, Jr., extorted $11,000.00 from Tri-Coast by threatening work slowdowns, stoppages, and physical harm in violation of 18 U.S.C. § 1951. In Count 57, Carlock, Sr., was alleged to have demanded and received cash payments from Garland Davidson in exchange for three work referral slips, signed in blank, in violation of 29 U.S.C. § 186.

Count 59 charged that Laird and Greer obstructed justice in violation of 18 U.S.C. § 1503. According to this count, Laird and Greer attempted to influence Jerry Wade French to lie to a federal grand jury that was investigating the racketeering activities ultimately charged in this indictment. Similarly, Count 60 charged Byrd with lying to a federal grand jury in violation of 18 U.S.C. § 1503.

### B. *The Trial and Conviction*

Trial began in Lake Charles, but was transferred to Monroe, Louisiana, when a jury could not be qualified in Lake Charles. At the close of the government's case, the court dismissed Counts 13–20 against Scimemi. The jury acquitted Brabham of all charges, and acquitted Carlock, Sr., of Counts 56–58.[5] The jury also acquitted Carlock, Jr., on Counts 12, 56, and 58,[6] and acquitted Laird and Scimemi on Counts 29–30.

The jury convicted the remaining defendants on all other charges left for its deci-

sion. All were convicted of racketeering and conspiracy to racketeer. Carlock, Sr., and Carlock, Jr., were also convicted of investing money obtained through racketeering in another enterprise, in violation of 18 U.S.C. § 1962(a). Carlock, Sr., was additionally convicted on thirty-one counts charging that in his capacity as an employee representative he demanded or accepted items of value from an employer, in violation of the Taft-Hartley Act, 29 U.S.C. § 186(b), and twenty-one counts of interference with commerce through extortion, in violation of 18 U.S.C. § 1951. Carlock, Jr., was convicted of eight counts charging demand or acceptance of items of value from employers. Laird was convicted on four counts of extortion, and one count of obstruction of justice in violation of 18 U.S.C. § 1503. Scimemi was convicted on eleven extortion counts. Greer was tried separately. We decide his appeal in a separate opinion issued this day.

### II

Each defendant challenges the sufficiency of the evidence. We treat each challenge in turn, viewing the evidence in the light most favorable to the government and drawing all credibility choices and reasonable inferences in favor of the verdict. *United States v. Aguirre Aguirre*, 716 F.2d 293, 297 (5th Cir.1983). We ask whether a reasonable juror could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

### A. *Carlock, Sr.*

Carlock, Sr., was convicted of conspiracy to racketeer and racketeering in Count 1 and Count 2, of investing funds derived through racketeering activity in an enterprise in Count 3, and of fifty-two other counts, encompassing Hobbs Act and Taft-Hartley Act violations.

---

5. The jury found Carlock, Sr., guilty of embezzling work referral slips as a racketeering act, but declined to convict him of a substantive count based on this embezzlement.

6. The jury found Carlock, Jr., guilty of extorting the repair payments by Pullman-Torkelson as a racketeering act, but acquitted him of Count 12 based on this extortion.

Carlock, Sr., limits his insufficiency arguments to his convictions for conspiracy to racketeer and racketeering in Counts 1 and 2 of the indictment. Specifically, he argues that the evidence was insufficient to establish his commission of six racketeering acts on which the jury found him guilty. Because the conspiracy charged in Count 1 entailed all of the elements charged in Count 2 and the additional element of an agreement, we treat Carlock, Sr.'s arguments regarding Count 2 first.

### 1. *Count 2*

■ To prove the substantive racketeering violation alleged in Count 2, the government must prove (1) the existence of an enterprise; (2) that Carlock, Sr., was associated with the enterprise; (3) that he participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, and (4) that the enterprise affected interstate commerce. *United States v. Bright*, 630 F.2d 804, 829 (5th Cir.1980). Carlock, Sr., challenges the sufficiency of the evidence with regard to the pattern of racketeering activity only.

We note at the outset, however, that the jury found Carlock, Sr., guilty of twenty racketeering acts in both Counts 1 and 2, that he challenges only six of the racketeering acts, and that the convictions would stand even if we found his arguments meritorious. Section 1962(c) of Title 18 provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

A pattern of racketeering activity is defined as at least *two* acts of racketeering activity, one of which occurred after the effective date of the RICO statute and the last of which occurred within ten years after the commission of a prior act of rack-

eteering activity. 18 U.S.C. § 1961(5); *see also United States v. Phillips*, 664 F.2d 971, 1011–12 (5th Cir.1981).

■ Carlock, Sr.'s sole attack upon Count 2 is that the evidence was insufficient for six of the twenty racketeering acts. The first three racketeering acts challenged by Carlock, Sr., alleged that he violated the Hobbs Act, 18 U.S.C. § 1951, by extorting payments from D & S Steel Builders, Inc. and by extorting, or attempting to extort, sexual favors from two female union workers. Section 1951 prohibits obstructing, delaying or affecting commerce by extortion, which it defines as follows:

> [T]he obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951(b)(2). Carlock, Sr., argues that in attempting to prove the three Hobbs Act violations, the government failed to show that he exploited a fear reasonably held by the victims.

There was evidence that Carlock, Sr., forced D & S to rent his equipment at excessive prices to ensure union peace.[7] D & S wanted to use three of its own skilled operators on its project. Carlock, Sr., initially rejected this request and, at the same time, suggested that D & S rent his equipment. Because the operators supplied by Local 406 could not operate the equipment necessary for the project and progress was therefore minimal, D & S agreed to rent Carlock, Sr.'s equipment. Carlock, Sr., then allowed D & S to use its own operators. The rentals were unnecessary, since D & S already owned the types of equipment it was forced to rent. Moreover, the rented equipment was in very poor condition and some of it was inoperable from the start of the rental period.

Although Carlock, Sr., argues that he never threatened D & S, the evidence shows that he made it clear that D & S

---

7. The jury found Carlock, Sr., and Carlock, Jr., guilty of this act as Racketeering Act Two, but declined to convict them on a substantive count regarding this event.

would not be allowed to use its own skilled operators until D & S rented equipment from him. Since D & S's contract provided for liquidated damages for delay in completion, we are persuaded that a jury could conclude that the fear of threatened loss was reasonable, keeping in mind that fear of economic loss is covered by the Hobbs Act. *United States v. Sander*, 615 F.2d 215, 218 (5th Cir.1980).

We are also persuaded that there was sufficient evidence to establish that Carlock, Sr., threatened two workers with economic loss unless they met his sexual demands in violation of La.Rev.Stat. 14:66 (West 1976). To establish extortion under the laws of Louisiana, it is not necessary to show that the threat was successful in obtaining property, but only that the threat was made to the victim to obtain something of value from her. *Id.* In *State v. Moore*, 419 So.2d 963, 967 (La.1982), the Louisiana Supreme Court held that sexual favors are a thing of value within the meaning of the statute. Not only did the evidence show that Carlock, Sr., requested sexual favors from two women, but it also showed that through Greer, he threatened one female with acid, threatened her ex-husband, shot out her window when she resisted, and caused her to be laid off of her job.

The remaining three racketeering acts attacked by Carlock, Sr., are drawn from his extortion of kickbacks from Local 406 members under the guise of his legal defense fund. He argues that these "contributions" were voluntary, and that, in any event, he never participated in nor organized these solicitations.

The evidence showed that an official defense fund established by Local 406 failed to cover Carlock, Sr.'s expenses from the Ellender Bridge trial. As a result, Scimemi and Greer, among others, solicited additional contributions from union workers on behalf of Carlock, Sr. Gene Barr, a member of Local 406, testified that Greer and Scimemi requested monthly contributions of approximately $50.00 or $100.00 with the understanding that those workers who refused to contribute would not receive job referrals. Unlike the official defense fund, no checks were accepted and no receipts given. Carlock, Sr., received lists of the persons who contributed and how much they paid. James LeDoux, a union member, testified that union members who challenged the collection or refused to contribute were called by members of the conspiracy and told to get their business straight with the local. If the workers continued to resist making such payments, they were denied job referrals or later laid off. Meanwhile, Carlock, Jr., and Laird ensured that contributing members received work. Indeed, Byrd, another union member and confederate of Carlock, Sr., testified that several contributing members were paid for work they did not in fact perform. While these collections were ongoing, Carlock, Sr., drove an expensive car, carried substantial cash, and took frequent vacation trips to resorts in Mexico. When Davidson asked how he could afford his frequent trips to Mexico, Carlock, Sr., replied that he was getting the money from his legal defense fund.

The New Orleans office of Local 406 learned of this supplemental collection practice and instructed the Lake Charles district office to stop and refund the money. The evidence showed that Greer agreed to stop collecting money but later resumed the practice, suggesting that solicitations be confined to union workers who would not complain in order to keep the Federal Bureau of Investigation and the New Orleans office from learning about the collections, from which Carlock, Sr., netted approximately $38,000.00.

The jury could have reasonably concluded from this evidence that Carlock, Sr., knew of the co-defendants' activities, that he approved of their actions on the job sites, that he accepted cash payments collected from the workers, and that he denied job referrals to members who failed to contribute to his fund. This was sufficient to allow the jury to find racketeering activity. *See United States v. Wilford*, 710 F.2d 439, 448 (8th Cir.1983), *cert. denied*, 464

U.S. 1039, 104 S.Ct. 701, 79 L.Ed.2d 166 (1984).

### 2. *Count 1*

■ Proof of a racketeering conspiracy requires not only the elements of the substantive racketeering count described above, but also the additional element of agreement among the parties to conduct the racketeering activity. *Phillips,* 664 F.2d at 1012. Such agreement may be inferred from a concert of action, or "a development and a collocation of circumstances." *United States v. Aguirre Aguirre,* 716 F.2d 293, 297 (5th Cir.1983) (quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). Moreover, evidence of criminal acts committed before the period charged in the indictment may be admissible as bearing on the existence and purpose of the conspiracy charged. *Id.* The evidence of an agreement was sufficient below, and indeed is not even challenged by Carlock, Sr.

### B. *Carlock, Jr.*

Like his father, Carlock, Jr., was convicted of Counts 1 and 2 for conspiracy to racketeer and racketeering; Count 3 for investing income derived through racketeering in violation of 18 U.S.C. § 1962(a); and Counts 4–11 for receiving rental payments in violation of the Taft-Hartley Act, 29 U.S.C. § 186, from Abshire and Pullman-Torkelson. Carlock, Jr., attacks the sufficiency of the evidence supporting his convictions on all counts.

Specifically, Carlock, Jr., alleges that proof of the racketeering acts supporting Counts 1, 2, and 3 was insufficient, that the government failed to prove a nexus between his racketeering activities and his position in the union, and that the government did not prove that his activities had any effect on Local 406. We are not persuaded.

### 1. *Count 2*

Carlock, Jr., was found to have committed four racketeering acts underlying Counts 1 and 2: two charging the receipt of the Pullman-Torkelson and Abshire payments in violation of 29 U.S.C. § 186 and two charging extortion of Pullman-Torkelson and D & S in violation of 18 U.S.C. § 1951. The two § 186 violations were also charged as substantive Counts 4–11 and as racketeering acts underlying Count 3.

a. *Predicate Acts.* As predicate acts to Counts 1, 2 and 3 and as substantive Counts 4–11, Carlock, Jr., was found to have accepted payments from local employers in violation of the Taft-Hartley Act, 29 U.S.C. § 186. Carlock, Jr., argues that the evidence was insufficient to establish that the rentals to Abshire and Pullman-Torkelson were not at the prevailing market price in the regular course of business, and that therefore the government failed to meet its burden of proving that the rentals were outside the statutory proviso allowing purchases and sales at prevailing market price. Section 186 provides:

> (a) It shall be unlawful for any employer … to pay, lend, or deliver, or agree to pay, lend or deliver, any money or other thing of value—
>
> > (1) to any representative of any of his employees who are employed in an industry affecting commerce; …
>
> (b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.
>
> (c) The provisions of this section shall not be applicable …
>
> > (3) with respect to the sale or purchase of an article or commodity at the prevailing market price in the regular course of business.

Basically, Carlock, Jr., presents the testimony favorable to his defense, while minimizing the government evidence presented to the jury.

■ We are persuaded that sufficient evidence was presented at trial to support the jury's conclusion that the rentals were not at the prevailing market price for the age

and condition of the rented equipment.[8] R.L. Abshire, president of R.L. Abshire Construction Company, testified that his company, while engaged in a project at the Strategic Petroleum Reserve Site in Hackberry, Louisiana, rented a D–5 medium-sized bulldozer from Carlock, Sr., through Cat-Low to "keep peace on the job." At the time of the rental, Abshire had experienced "minor problems" with the union. Although the rental was allegedly from Cat-Low, Abshire testified that it was negotiated by Carlock, Sr., and that payments were made directly to Carlock, Sr., or to master mechanic Davidson. Between September 1978 and May 1980, Abshire paid Cat-Low more than $65,000.00 for the bulldozer. With $65,000.00, Abshire could have purchased a new one. He noted that the price, while reasonable for a lease-purchase agreement, was unreasonable in the straight lease context, since his company never developed any equity during the lease period.

Clarence Freeman, the superintendent for Pullman-Torkelson at the Nelson Power Plant site in Westlake, Louisiana, testified that from the outset labor difficulties at the site, particularly with Local 406 operators, delayed the project. According to Freeman, the problems were alleviated when, contrary to the company practice of taking and honoring competitive bids, Pullman-Torkelson rented several pieces of heavy equipment from Cat-Low at Carlock, Sr.'s suggestion. Elmer Richard, the field office manager at the site, testified that one of the pieces of equipment rented, an old bulldozer, was inoperable from the time of delivery and could not even be driven off of the trailer. Freeman testified that Carlock, Sr., demanded not only that Pullman-Torkelson rent the bulldozer, but that it pay to have it overhauled and repaired. Chet Leonard, the project manager for Pullman-Torkelson, consented because he had learned that Carlock, Sr., was the owner of the equipment and because he was fearful of him.

Carlock, Jr., argues that, in any event, the convictions for racketeering and conspiracy to racketeer in Counts 1 and 2 cannot be upheld on the basis of the Taft-Hartley violations because he was not an officer or employee of the union and because the government failed to prove that the benefits of the rentals accrued to Carlock, Sr. We leave this argument for later discussion, now treating the remaining two predicate acts.

These predicate acts charged Carlock, Jr., with extorting, or aiding and abetting the extortion of, equipment rentals from D & S and repair payments from Pullman-Torkelson.[9] To convict Carlock, Jr., of aiding and abetting such acts, the government had to show that he willfully associated himself with the criminal venture and willfully participated in it as something he wished to bring about. *United States v. Aguirre Aguirre*, 716 F.2d 293, 298 (5th Cir.1983). Carlock, Jr., admits knowing that his father was using his name in the criminal enterprise, but contends that proof was insufficient to sustain a conviction for aiding and abetting the extortion, and that in any event there was no extortion to aid. Again, we are not persuaded.

Viewed in the light most favorable to the verdict, the evidence was sufficient for the jury to find that Carlock, Jr., accepted improper rental payments from D & S on

---

**8.** The statutory exception of § 186(c)(3) is narrow and to be strictly applied. *Bricklayers, Masons & Plasterers International Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1025 (5th Cir.1975). The language of the proviso seems to apply only to purchases and sales, and not rentals. Although a substantial question exists whether § 186(c)(3) applies to rentals, an issue we do not decide today, the trial court instructed the jury that rentals were within the sale or purchase language of § 186(c)(3). The jury convicted the defendants, thereby finding that the rentals were not at market rates. In short, the trial court's instruction gave defendants the benefit of an arguably inapplicable proviso, and gave defendants the jury argument that the leases were at market rates, an error that could not have prejudiced the defendants.

**9.** We note that the jury did not convict Carlock, Jr., of the substantive count based upon the extortion of repair payments from Pullman-Torkelson, but did find him guilty of a racketeering act based on this conduct.

behalf of his father.[10] There was evidence that he accepted the payments, put them in a bank account in his own name, paid taxes on the income, and then obtained a cashier's check for almost the full amount for his father.

The jury also found that Carlock, Jr., extorted the cost of repairing a bulldozer from Pullman-Torkelson. This bulldozer, as testified by Richard, was inoperable at the time of delivery and had to be pulled off the trailer. Contrary to Carlock, Jr.'s argument, the evidence is sufficient to establish that Pullman-Torkelson had a reasonable fear of economic loss which the conspirators exploited. The evidence demonstrated that Pullman-Torkelson's fear of economic injury resulted from the cumulative effect of innuendo and statements which led it to believe that Carlock, Sr., would create significant labor problems if they did not agree to his demands. While Carlock, Sr., was the primary mover in this episode, Carlock, Jr., clearly associated himself with the enterprise by accepting the payments, thereby providing the cover for his father.

■ b. *Nexus to the Enterprise.* To meet RICO's nexus requirement, the government must prove beyond a reasonable doubt that the defendant has in fact committed at least two of the racketeering acts alleged, that the defendant's association with the enterprise facilitated his commission of the racketeering acts, and that the predicate acts had some effect on the enterprise. *United States v. Cauble,* 706 F.2d 1322, 1332 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 224 (1984). We are persuaded that the government has met its burden here.

■ Carlock, Jr., argues that the government failed to prove a nexus between the enterprise, Local 406, and his commission of the racketeering acts. He contends that he received the payments in an individual capacity and not as a member of the union. However, contrary to Carlock, Jr.'s arguments, he need only be associated with the enterprise and participate, directly or indirectly, in the conduct of its affairs to be found guilty. *See, e.g., United States v. Bright,* 630 F.2d 804, 830 (5th Cir.1980); *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Moreover, Carlock, Jr., was a member of Local 406 and was often appointed to positions of power by his father. The evidence was sufficient for the jury to reasonably conclude that Carlock, Jr. received the payments because of his association with the criminal enterprise.

■ Carlock, Jr., also argues that the racketeering acts had no effect on Local 406 because the proceeds of the rentals inured to the benefit of Carlock, Jr., and Carlock, Sr., personally. However,

> [t]he government need not prove that the racketeering activity "benefitted" or "advanced the affairs of" the enterprise. Nor must the government demonstrate that the enterprise itself was corrupt or that it authorized the defendant's conduct. The prosecution need prove only that the racketeering acts affected the enterprise in some fashion.

*Cauble,* 706 F.2d at 1333 n. 24 (citations omitted). Because the conspirators controlled Local 406 through Carlock, Sr.'s position as business agent and Carlock, Jr.'s role as master mechanic, proof of the commission of the racketeering activities satisfies the nexus requirement. *Id.* Contrary to Carlock, Jr.'s argument, the government need not prove that the rental income was deposited in the coffers of Local 406.

## 2. *Count 1*

Proof of racketeering conspiracy requires the substantive elements of a racketeering violation described above, as well as an agreement to commit the racketeering activity. Carlock, Jr., argues that the government failed to prove that he agreed to commit an offense against the United States and that he agreed to participate in the affairs of the enterprise.

---

**10.** These events are summarized in the discussion of Carlock, Sr.'s challenges.

■ Because the evidence established that Carlock, Jr., participated in the receipt of and extortion of payments from local contractors in violation of the Taft-Hartley Act and RICO, the jury was free on this record to find him a member of the RICO conspiracy. Accepting the government's proof, as the jury was free to do, the inference of an agreement from his commission of such acts is unmistakable. *See United States v. Elliott*, 571 F.2d 880, 903 (5th Cir.1978).

### 3. *Count 3*

■ Carlock, Jr., next attacks his conviction on Count 3 for a violation of 18 U.S.C. § 1962(a), which prohibits the use of illegally-derived funds to acquire or maintain an interest in an enterprise by legal means. To prove that Carlock, Jr., committed this offense, the evidence must show (1) the existence of an enterprise; (2) that Carlock, Jr., derived income from a pattern of racketeering activity; (3) that Carlock, Jr., used or invested, directly or indirectly, any part of that income to acquire an interest in or to operate the enterprise; and (4) that the enterprise was engaged in or that its activities affected commerce. *Cauble*, 706 F.2d at 1331. As summarized above, the evidence sufficiently established that Carlock, Jr., and his father derived income through improper rentals from Abshire and Pullman-Torkelson and used that money to operate Cat-Low. Carlock, Jr., does not challenge the existence of the enterprise Cat-Low and its effect on interstate commerce.

### 4. *Counts 4–11*

These counts charging receipt of payments from Abshire and Pullman-Torkelson were also listed as racketeering acts under Counts 1, 2 and 3. They were discussed above in connection with those counts, where we found the evidence was sufficient to support the jury's verdict.

### C. *Laird*

Laird was convicted of Counts 1 and 2 for conspiracy to racketeer and racketeering, as well as Count 59 for obstruction of justice. Laird was also convicted of Counts 31–34 for extortion of Mar-Len by the wrongful use of threatened and actual force, violence and fear, unless Mar-Len paid for, and continued to employ, the road-boring services of CAFI.[11] Counts 31–34 also constituted Racketeering Act 26, which supported the convictions for Counts 1 and 2.

■ Laird argues that his conviction on Racketeering Act 26 and Counts 31–34 was not supported by sufficient evidence.[12] He argues that the government failed to prove his presence at the meeting in which Ann Blackwell, Mar-Len's project manager, was forced to employ CAFI. Blackwell, however, placed Laird at the scene. This was enough to tie Laird to the scene, because the jury was entitled to disbelieve Laird's witnesses who testified either that he was out of town or that they did not see him on the premises at the time of the meeting.

The jury was also entitled to infer from the evidence that Laird's constant presence beside Carlock, Sr., was intended to support the extortion of Mar-Len. While Laird did not threaten Blackwell directly, he always accompanied Carlock, Sr., on his visits to the Hackberry site, affirmed Scimemi's demands for exorbitant truck rentals, refused to replace Scimemi as master mechanic at the site, and in general provided support by his presence throughout the duration. The outline of his gun through his jacket also indelibly impressed Blackwell during the course of one meeting. Such supportive conduct is sufficient for a conviction under the Hobbs Act. *See, e.g., United States v. Ciambrone*, 787 F.2d 799 (2d Cir.1986) (defendant's presence "lent

---

**11.** Laird was acquitted of Count 30, which charged extortion of the first payment from Mar-Len to CAFI, but convicted of Counts 31–34 charging the subsequent payments.

**12.** By implication, Laird also challenges his convictions on Counts 1 and 2, since the jury found Laird guilty of only two racketeering acts supporting these counts and he challenges the sufficiency of one of them.

weight and authority to the prior and subsequent threatening conduct and action" and supported the racketeering conviction, even though defendant did not participate in every aspect of the criminal venture).

Finally, Laird repeats the sufficiency challenges to his Hobbs Act convictions discussed earlier with regard to Carlock, Sr., and Carlock, Jr., namely that the government failed to prove that Mar-Len had a reasonable fear which the conspirators exploited. Blackwell testified that Mar-Len submitted to the demands of Carlock, Sr., Laird, and Scimemi because it wanted to prevent union-instigated delays and equipment sabotage and because Blackwell feared them personally. We are persuaded that the evidence sufficiently established that the conspirators exploited fears reasonably held by Mar-Len.

### D. *Scimemi*

Scimemi was convicted of conspiracy to racketeer and racketeering in Counts 1 and 2, which were supported by the jury's finding of Racketeering Acts 25–27 charging Scimemi with acts of extortion in violation of La.Rev.Stat. 14:66 and the Hobbs Act. Racketeering Act 25 charged Scimemi with extortion of Mar-Len by threatening to kill James Smith if Mar-Len did not replace him at the Hackberry site. Racketeering Act 26 charged Scimemi with threatening representatives of Mar-Len with work slowdowns, stoppages, and physical harm unless Mar-Len retained the services of CAFI. Finally, Racketeering Act 27 charged Scimemi with similar conduct in forcing Mar-Len to rent various pieces of construction equipment from Tri-Coast.

Racketeering Acts 26 and 27 were also charged as substantive Counts 31–41. Counts 31–34 charged separate payments extorted from Mar-Len on behalf of CAFI, while Counts 35–41 charged the payments made by Mar-Len to Tri-Coast.

Scimemi challenges his conviction of all counts. To convict Scimemi of racketeering and conspiracy to racketeer, it is necessary to find that he participated in at least two racketeering acts. The jury found Scimemi guilty of three. His conviction on Counts 1 and 2 will therefore stand so long as the evidence of any two of these racketeering acts is sufficient.

■ Scimemi first attacks his conviction on Racketeering Act 26 and Counts 31–34, which alleged the extortion of Mar-Len on behalf of CAFI, by presenting only the testimony favorable to his defense. The jury could have reasonably concluded, however, that Carlock, Sr., Scimemi, and Laird forced Mar-Len to retain CAFI despite its inferior performance through subtle threats of economic loss. Blackwell testified that walk-outs and jurisdictional disputes were threatened if Mar-Len made any effort to replace CAFI, and that Carlock, Sr., told her to keep CAFI because Vernon Causey was "a good boy." This evidence sufficiently establishes the threats and reasonable fear necessary to support a Hobbs Act conviction.

Scimemi also attacks the evidence supporting his conviction under Racketeering Act 27 and Counts 35–41, for extorting rental payments from Mar-Len on behalf of Tri-Coast. We are persuaded that the evidence was sufficient to support the jury's conclusion that Scimemi was involved in this extortion. Indeed, according to Davidson, Scimemi was a catalyst for the rentals. Davidson testified that Carlock, Sr., and Scimemi approached him and offered to arrange for his construction equipment to be rented to Mar-Len. At the time, Mar-Len rented its heavy equipment from its parent company, Mar-Len, Inc., a Texas corporation. Davidson testified that Scimemi stated that he would prevent Texas contractors from making money on the Hackberry project by disabling Mar-Len's equipment. Mar-Len then began to suffer equipment difficulties, sabotage and labor problems. Scimemi also repeatedly threatened Blackwell and reminded her of the Ellender Bridge and Jupiter Chemical incidents, insinuating that history could repeat itself at the Hackberry site. His conten-

tion that the government failed to prove his participation in this extortion is meritless.[13]

### III

 Defendants also challenge their convictions as products of undue pre-indictment delay and argue that the indictment should have been dismissed for that reason.[14] There is no sixth amendment right to a timely indictment. Protection from delay in indictment must be found in the due process clause of the fifth amendment. *United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982). That protection is limited. The passage of a long period of time between knowledge by the prosecution of indictable conduct and an indictment is not enough, even if the delay was harmful to a defendant. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). Rather, the defendants must show that the government intentionally delayed the indictment to gain a tactical advantage, and that the delay caused them actual and substantial prejudice. *United States v. Ballard,* 779 F.2d 287, 293 (5th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986).

 Carlock, Sr.'s and Scimemi's only assertion of harm from pre-indictment delay at trial was that they were "unable to

properly prepare a defense." This argument was properly rejected for failure to even allege actual prejudice and intentional delay by the government.[15] Defendants for the first time in their appellate brief attempt to identify prejudice. We refuse to entertain allegations of prejudice made for the first time on appeal. Regardless, there is no hint below or here that any delay was intentional and to gain a tactical advantage.

Laird in turn argues that pre-indictment delay hindered his ability to defend Counts 31–34 and Racketeering Act 26, which allege extortion of Mar-Len on behalf of CAFI. However, Laird also failed to raise this issue below and we similarly refuse to entertain arguments first made on appeal.

### IV

Carlock, Sr., argues without citation that the judge incorrectly refused to require a bill of particulars and that the indictment was improperly enlarged by the admission of evidence of racketeering acts not alleged. He also challenges the broad indictment[16] under RICO as unconstitutional because it did not provide adequate notice of the charges against him and because it

---

**13.** Because we are persuaded that the evidence is sufficient for a jury to find that Scimemi extorted payments from Mar-Len on behalf of CAFI and Tri-Coast, we need not address the question whether the Louisiana extortion statute covers Scimemi's threat to murder Smith if Mar-Len retained his services on the Hackberry site. The government argues that the Louisiana extortion statute, La.Rev.Stat.Ann. § 14:66, makes clear that the threat may suggest injury to an individual other than the person to whom the threat is communicated. While this is true, "other persons" on the face of the statute is limited to family members and others held dear to him. It is not clear that the statute encompasses threats to an unrelated employee. The finding was of no consequence, and we leave this question to the Louisiana courts, or in any event, to a later day.

**14.** The defendants also challenged the actions of a Senate Subcommittee which investigated the racketeering activities and asked that indictments be pursued. As we earlier noted, their challenge is without force or merit.

**15.** In his motion to dismiss all charges not particularized, Carlock, Sr., asserted below "that the government has had knowledge of the conduct, for which defendant is herein sought to be punished, for many years. Defendant shows that the laches and/or negligence of the government in failing to bring these charges within a reasonable time after the occurrence of said events is an additional ground for dismissal of all charges, especially where the government is unable or unwilling to furnish the particulars of the date, time, and place of each alleged occurrence of criminal conduct." These actions of negligent delay do not amount to an allegation of intentional delay, nor do they indicate how defendant was prejudiced by the delay.

**16.** The co-defendants complain strongly about the broad language "further part of the conduct of the affairs of the enterprise," which was used to admit evidence of other acts.

allowed evidence of prior bad conduct to support a present conviction.

## A

■ The purpose of a bill of particulars is to provide sufficient notice of a charge for its defense and to minimize surprise at trial. The decision to grant a bill of particulars is entrusted to the court's discretion and for a denial of a bill to rise to the level of reversible error, it must cause surprise at trial and substantial prejudice. *United States v. Vesich,* 726 F.2d 168, 169 (5th Cir.1984).

■ Carlock, Sr., asserts that he needed dates, times, and places to prepare his defense. We are directed to no identifiable prejudice and are unable to find that Carlock, Sr., was surprised or that he was prejudiced as a result of any denial of the bill. We are therefore not persuaded that the trial court abused its discretion in finding that the indictment stated the charges with sufficient clarity.

## B

■ Carlock, Sr., also argues that the indictment was enlarged by the admission of facts regarding loans, threats and sabotage not alleged in the indictment. After reviewing the record, we are persuaded that no surprise or prejudice occurred.

Carlock, Sr., complains of inadequate notice that evidence of loans by union members for his benefit would be introduced at trial since these matters were not specifically alleged in the indictment. Other flaws aside, this argument fails because defendants were accorded open file discovery including access to government exhibits. Whether or not this access was required as an alternative to a bill, it was provided and gave ample notice of the government's intention to introduce evidence about the loans.

Carlock, Sr., Laird and Scimemi also complain that the Ellender Bridge and Jupiter Chemical incidents were admitted as evidence of the atmosphere of violence and fear created by Carlock, Sr., despite their absence from the indictment. We are not persuaded.

■ While not listed as predicate acts, these incidents were specifically mentioned in Count 1, ¶ 3 of the indictment. Thus, the defendants cannot claim surprise at their introduction. Furthermore, defendants advanced their criminal enterprise by reminding reluctant local contractors and union members of them. Since the government is not limited to the overt acts pleaded in the indictment in proving a conspiracy, but may show other acts of conspirators occurring during its life, *United States v. Elliott,* 571 F.2d 880 (5th Cir.1978),[17] this evidence was admissible.

Carlock, Sr., next contends that no notice was given of James LeDoux's testimony that Davidson threatened him in connection with the solicitation of defense funds for Carlock, Sr. While this particular incident was not alleged in the indictment, allegations of similar acts of extortion are found throughout the indictment, and Carlock, Sr. had sufficient notice that this type of evidence would be introduced. No more is required.

Finally, Carlock, Sr.'s argument that the indictment was enlarged by evidence that equipment was sabotaged is without merit. Such acts are implicit in the extortion counts and are evidentiary detail which need not be spelled out in the indictment. *United States v. Gordon,* 780 F.2d 1165, 1172 (5th Cir.1986).

## C

■ As best we can determine, the constitutional challenge to the RICO statutes is that RICO "allows trial by ambush" and evidence of prior bad conduct in such a fashion as to deny defendants their rights

---

17. This case involved the introduction of two additional acts of trafficking narcotics which were not specifically alleged in the indictment. The court found sufficient notice because the allegations of narcotics trafficking gave the defendants notice that this type of evidence would be put forth at trial.

under the fifth and sixth amendments. We reject this blunderbuss assertion. As we have explained, Carlock, Sr., had adequate notice of the charges and fails to identify any difficulty in meeting the government's evidence because of ill-defined charges. We are satisfied that the indictment in this case afforded adequate notice.

## V

■ Carlock, Sr., argues that his constitutional rights to compulsory process and effective assistance of counsel were violated by the court's refusal to order his subpoenas at government expense as authorized by Fed.R.Crim.P. 17(b). The rule requires not only a showing of need for the witness, but also an inability to pay the fees. Carlock, Sr., has failed to show either.

The district court found that Carlock, Sr., could afford the subpoena fees, pointing out that he was able to hire a second attorney two weeks before trial.[18] Our review is also informed by the absence of any evidence of prejudice. Carlock, Sr., never identified any witness who was unavailable for lack of a subpoena; indeed of the eleven witnesses called at trial by Carlock, Sr., nine were listed on his request for eleven subpoenas. We are persuaded that no abuse of discretion occurred. *United States v. Ramirez*, 765 F.2d 438, 441 (5th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 812, 88 L.Ed.2d 786 (1986).

## VI

Carlock, Sr., challenges as impermissible expressions of opinion the testimony of two witnesses that union referrals were not given out fairly. This testimony provided evidence of deviations from the "out-of-work" list of Local 406 and was relevant to the government's contention that the conspirators favored certain cooperative union members. Carlock, Sr., argues that a proper foundation was not laid for the testimony, that it was not the best evidence, and that it was misleading and prejudicial because the out-of-work list was not a determinant of job referrals.

■ Rule 701 of the Federal Rules of Evidence provides

If a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions and inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

There must be sufficient evidence to support a finding that the witness has personal knowledge of the facts from which the opinion is derived. *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 263 (5th Cir.1980). There must also be a rational connection between the opinion and the observed factual basis from which it is derived. *Id.* Finally, the opinion must be helpful to the trier of fact in understanding the testimony or determining an issue of fact. *Id.*

■ Contrary to Carlock, Sr.'s arguments, a proper foundation was laid for this opinion testimony. The two witnesses were established as secretaries in Carlock, Sr.'s office with personal knowledge of the facts on which they based their opinions. The best evidence rule was not implicated because the purpose of the testimony was not to prove the contents of the out-of-work list, but to show only that the list was not always followed.[19] Similarly, that the witnesses did not review the referral records before testifying at trial affects the weight of their testimony, not its admissibility.

Carlock, Sr., also challenges the admission of testimony regarding his ownership of heavy equipment and his interest in vari-

---

18. One had been appointed earlier at government expense. However, at that time the court noted that defendant's need was a close matter in light of defendant's stated income and assets.

19. Three union workers supported this testimony with direct testimony that they were denied jobs by unfair variations from the out-of-work list.

ous businesses.[20] He argues that this evidence was central to the Hobbs Act and Taft-Hartley Act violations, and thus its admission requires reversal of convictions on all affected counts.

Della Ardoin, the secretary for Pullman-Torkelson and Carlock, Sr.'s former secretary at Local 406, testified that she knew he owned the heavy equipment rented to Pullman-Torkelson because she saw an invoice and put "two-and-two" together with other information, the nature of which she can no longer recall. The government argues that Ardoin's testimony was within the ambit of Rule 701.

■ We are persuaded that receipt of this testimony as lay opinion was error. There was no showing of a basis for her opinion beyond her work in the office. Thus, we cannot ascertain if the testimony was based upon facts within her personal knowledge sufficient to make her opinion more than an educated guess. Unlike expert opinion, where the opinion is the product of applying special skill in some art, trade, or profession acquired apart from the case, lay opinion expresses a conclusion drawn from observations in circumstances where it is impractical, if possible at all, to recount the observed "factual" components of the opinion. The common illustrations are an expression of opinion by a lay observer of a car's speed or a person's expression or emotional state (he was furious). Because these opinions draw upon the facts in the case itself, they are more easily confronted than are expert opinion, whose source is often extraneous to the case at trial. As such, receipt of lay opinion is much less likely to be prejudicial, especially where its role is cumulative and is not essential to the sufficiency of the

evidence, as here. *See Lubbock Feed Lots, Inc.,* 630 F.2d at 263.

■ It follows that we must "examine all of the other evidence to see 'whether the trier of fact would have reached the same result without the tainted evidence.' " *United States v. Lay,* 644 F.2d 1087, 1091 (5th Cir.1981) (quoting *Null v. Wainwright,* 508 F.2d 340, 343 (5th Cir.); *cert. denied,* 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975)). There was independent evidence of Carlock, Sr.'s ownership interest in the equipment rented from Cat-Low. Juanita East, the former manager of Town and Country Apartments, testified that Carlock, Sr., claimed in an application to rent an apartment that he owned several construction companies, one of which was in his son's name. Brabham testified that he had loaned Carlock, Sr., money to purchase equipment, and referred to "Willard's check" when collecting rental payments on the equipment. Carlock, Sr.'s handwriting was also identified on documents reflecting the purchase of equipment on which he admittedly wrote his son's name. Coconspirator Davidson testified from his personal knowledge and from admissions of Carlock, Sr., that Carlock, Sr., owned the equipment. Finally, the abundant evidence of Carlock, Sr.'s dominance and control over Cat-Low's rentals also provide an ample basis for a compelling inference of ownership. In sum, while the lay opinion ought not have been admitted into evidence, it was fully and easily tested by cross examination and was cumulative at best. There was no prejudice sufficient to warrant a new trial.

We also note that the ownership of the equipment was not essential to the convictions on the extortion or the Taft-Hartley

---

**20.** Carlock, Sr., objected to the testimony of several other witnesses besides Ardoin as lacking proper foundation and being the product of multiple hearsay, confusion and assumptions. However, a review of the record shows that no such errors occurred. One of the witnesses cited by Carlock, Sr., was *not* allowed to testify as to the ownership of the equipment. Another

testified to the issue for the limited purpose of showing Pullman-Torkelson's state of mind in renting and repairing the bulldozer. *See United States v. Clemons,* 676 F.2d 124, 125 (5th Cir. 1982); Fed.R.Evid. 803(3). Finally, the last witness challenged was co-conspirator Davidson, who testified from personal knowledge and

counts.[21] The jury was properly instructed that a Hobbs Act prosecution may lie where the extorted payments are given to third parties. *See United States v. Clemente,* 640 F.2d 1069, 1078–80 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981). Hence, even if Carlock, Sr., had no interest in the equipment and received no direct benefits from its rent, he could still be found guilty of extortion under 18 U.S.C. § 1951.

## VII

Scimemi and Laird challenge the use of evidence of the Ellender Bridge and Jupiter Chemical incidents as a violation of their fifth and sixth amendment rights, even though this evidence was admitted by the court with repeated instructions limiting its use.[22] The co-defendants contend that the jury ignored the limiting instructions and that extreme prejudice resulted.

■ Contrary to defendants' contentions and as we have explained, the Ellender Bridge and Jupiter Chemical incidents were the genesis of the "solicited" defense fund. Scimemi repeatedly referred to these incidents when threatening others. The evidence was intertwined with the crimes charged and was not extrinsic to the indictment. To the contrary, the incidents were an integral part of the charged extortion offenses themselves. *See United States v. Nichols,* 750 F.2d 1260, 1264–65 & n. 2 (5th Cir.1985). It follows the district court did not abuse its discretion in declining to exclude the evidence under Fed. R.Evid. 403, because the probative value was not substantially outweighed by its possible prejudicial effect.

## VIII

Carlock, Sr., challenges the trial court's restriction of his cross-examination of Davidson as unfairly restrictive and harmful to his defense of Racketeering Act 29. On direct examination, Davidson testified that acting for Tri-Coast he gave money to Carlock, Sr. The court, generous in the range of cross examination allowed Carlock, Sr., permitted his lawyer to ask Davidson on cross examination if he had pocketed company funds and if he had many mortgages and loans outstanding at the time he was acting for Tri-Coast. Moreover, over objection, he was allowed to ask Davidson if he had used the money to purchase drugs or to rent a girlfriend's apartment. The court did not draw the line until counsel sought to ask if Davidson had used the money to pay for an abortion for one of his girlfriends and to pay for an apartment shared with someone else. Carlock, Sr., argues that these questions were necessary to demonstrate what Davidson had done with the money he admitted taking, in order to show that Davidson had given no money to Carlock, Sr. The court ruled that the probative value of these questions was outweighed by its potential for prejudice.

■ Limitation of the scope of cross-examination was within the discretion of the trial judge, and may be reversed only when the discretion was clearly abused. *United States v. Gordon,* 780 F.2d 1165, 1175 (5th Cir.1986). There was no abuse here in the trial court's refusal to allow further inquiry into prior acts of misconduct that were only marginally relevant and that plainly presented the specter of distracting testimonial side trips.

## IX

■ Carlock, Sr., contends that the government's questioning of Peter Babin III, the former financial secretary and of-

---

statements made by Carlock, Sr., himself. This testimony was properly admitted.

**21.** That ownership is irrelevant to the issue of Taft-Hartley Act violations is developed in Section X of this opinion, where we follow the Fourth Circuit's reasoning in *United States v. DeBrouse,* 652 F.2d 383 (4th Cir.1981).

**22.** Laird argues that he was particularly prejudiced by this evidence, since he was not even indicted in the prior state court trial. However, we are persuaded that the court's limiting instruction adequately protected him as well.

fice manager of Local 406, infringed his right to an impartial jury by asking for answers properly left to the jury. Babin testified that Carlock, Sr., had told him that he did not own any construction equipment and that he was not renting equipment to local contractors who employed Local 406 members. Babin then identified Carlock, Sr.'s signature on a purchase invoice for heavy equipment, which indicated that Carlock, Sr., owned this equipment at the time he denied such conduct to Babin. The government followed this identification by asking Babin if Carlock, Sr., was candid with him when Carlock, Sr., told him that he did not own any equipment. The objection was overruled but the answer was that Carlock, Sr., had not admitted that he was renting equipment. Carlock, Sr., claims this answer had a "devastating" effect on the question of his ownership of the companies. The argument is frivolous. The witness's answer was not harmful. While the question was accusatorial in form, and was a backhanded solicitation of lay opinion, it was not objected to on that basis. Regardless, it was but an irritant in a long trial and plainly harmless.

## X

The Taft-Hartley Act, 29 U.S.C. § 186, prohibits payments by employers to labor officials or representatives. Over timely objections, the judge instructed the jury that:

> The government can also satisfy the third element of a section 186(b)(1) violation by proving beyond a reasonable doubt that the defendant was an officer or employee of the entity identified as a labor organization in the indictment and that he knowingly and willfully requested or demanded that the alleged payment, loan or delivery be made to a third person at his behest. That is, proof beyond a reasonable doubt of a payment, loan or delivery to a third party at the behest of an officer or employee of the named labor organization, together with proof beyond a reasonable doubt of the first, second and fourth elements, will establish a violation of section 186(b)(1).

Carlock, Sr., and Carlock, Jr., contend that this instruction erroneously applies the statute because it does not require Carlock, Sr., to have benefited directly or indirectly from the payments. Carlock, Sr., challenges the instruction with regard to Counts 13–20 and Racketeering Act 20 of Counts 1 and 2, which are drawn from the rental payments Union Engineering made to Dana-K. Carlock, Jr., challenges the instruction with regard to Counts 4–11, Racketeering Acts 6 and 17–19 of Counts 1 and 2, and Racketeering Acts 2 and 3 of Count 3, which are drawn from rental payments made to Cat-Low by Abshire and rental and repair payments to Cat-Low by Pullman-Torkelson.

### A

In *United States v. DeBrouse*, 652 F.2d 383 (4th Cir.1981), DeBrouse, the president of Local 639 of the Teamsters, required an employer to make payments of $200 a week to his nominee, Vincent Caprio, for which Caprio performed no services. When the employer attempted to stop payment, he experienced labor troubles.

DeBrouse argued that since he did not receive any of the money paid to Caprio, he did not violate the Taft-Hartley Act. The Fourth Circuit rejected this theory, stating that:

> The critical question ... is whether § 186(a) prohibited the payments to Caprio. We believe that it did. Section 186(a) prohibits an employer from delivering anything of value to a representative of his employees. The government's proof showed that the employer delivered and agreed to deliver to DeBrouse the precise thing of value DeBrouse demanded, that is, payment of $200 a week to Caprio. Therefore, the fact that the thing of value, which the employer delivered to DeBrouse, took the form of payments to Caprio does not place the transaction beyond the scope of the Act. Having shown the employer's acquiescence in DeBrouse's demand, the government was not also required to prove that DeBrouse received the money.

*DeBrouse,* 652 F.2d at 388 (footnote omitted). The court also noted that Congress, in providing specific exemptions to the Act, did not exempt payments to third parties. *Id.*

Carlock, Sr., argues that the rental payments to Dana-K, owned by his former daughter-in-law, were for services actually rendered and therefore distinguishable from those in *DeBrouse,* and in any event, that the Fifth Circuit should not adopt the third-party beneficiary theory of *DeBrouse.*

The debatable step in *DeBrouse* is its construing a payment to a third party who never forwards that money to the union official as being of value to the union official. The Fourth Circuit found the required value in the power exacted by the official to direct payments to others; persuaded that Congress intended to reach such conduct because reading the statute otherwise would invite doubtlessly unintended circumvention of the statute. *See Roark v. Boyle,* 439 F.2d 497, 505 (D.C.Cir. 1970) (purpose of the statute is to obviate bribery of and extortion by officers, employees, and representatives of labor organizations).

We and the Third Circuit have given "similar" readings to the Hobbs Act. *See United States v. Hyde,* 448 F.2d 815 (5th Cir.1971); *United States v. Provenzano,* 334 F.2d 678, 686 (3d Cir.1964). The Hobbs Act defines extortion as "the obtaining of property from another." 18 U.S.C. § 1951(b)(2). Yet, in *Hyde,* we held that "[o]ne need receive no personal benefit to be guilty of extortion; the gravamen of the offense is loss to the victim." *Id.* at 843. Like the Hobbs Act, the Taft-Hartley Act is designed to protect the victim, the focus of § 186(b) being to protect employers from the misuse of power by union officials or employees. Persuaded by Judge Butzner's opinion, we join the Fourth Circuit and conclude that the district court's instruction to the jury was correct.

The jury was entitled to conclude that Carlock, Sr., directed that Pullman-Torkelson rent equipment from Dana-K, and that the employer did so at his direction. The fact that the thing of value, which the employer delivered to Carlock, Sr., constituted a payment to Dana-K does not place the transaction outside the scope of the Act. Having established that Pullman-Torkelson met Carlock, Sr.'s demands, the government did not have to establish that Carlock, Sr., received the payment. It is enough that Carlock, Sr., caused Dana-K to receive the payments by demanding them from an employer who is subject to the Act.

**B**

Carlock, Jr., goes one step further than his father. He argues that *DeBrouse* should not be adopted, but that even if it is, *DeBrouse* does not provide for liability on the part of the third party beneficiary.

Because we have found the power to direct payments to others is a thing of value within subsection (a) of § 186, Carlock, Jr.'s argument must fail. Section 186(b)(1) provides:

> It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

The jury instruction, as applied to Carlock, Jr., requires that he *knowingly* and *willfully* requested or received that payment in contravention of subsection (a). Contrary to Carlock, Jr.'s contention, this instruction does not catch innocent and unknowing recipients of favor from a union official.

Nor are we persuaded that this application of the Taft-Hartley Act creates due process concerns. Reasonable men need not guess at the statute's meaning.

**XI**

The judgment of the district court is AFFIRMED.