**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Walter L. NIXON, Jr.,**
**Defendant-Appellant.**

No. 86–4248.

United States Court of Appeals,
Fifth Circuit.

April 30, 1987.

---

**2.** Carter does not press on appeal her claim of pay discrimination.

William F. Goodman, Jr., Jackson, Miss., Fawer & Zatzkis, New Orleans, La., Benjamin C. Toledano, Pass Christian, Miss., Martha G. Carson, Ocean Springs, Miss., for defendant-appellant.

Reid H. Weingarten, Jan Nielsen Little, Attys., Washington, D.C., George Phillips, U.S. Atty., Jackson, Miss., for plaintiff-appellee.

Before VAN GRAAFEILAND,* GARWOOD, and JONES, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Walter L. Nixon, Jr. (hereinafter "appellant") appeals from a judgment of the United States District Court for the Southern District of Mississippi, convicting him of perjury before a grand jury. 18 U.S.C. § 1623. We affirm.

Although appellant's trial was a lengthy one, the events leading to his grand jury testimony may be fairly briefly summarized. Appellant had been a judge of the very court in which he was convicted since 1968, and Chief Judge of that court since 1982. A married man with three children, he had for some years prior to the incidents at issue herein been dissatisfied with his modest judicial salary, and had looked for means of augmenting it. In 1980, he found these means in the person of Wiley Fairchild, a successful investor in oil and gas properties. Through the intercession of Carroll Ingram, Fairchild's attorney, appel-

* Circuit Judge of the Second Circuit, sitting by designation.

lant was able to purchase an interest in three oil well properties at an extremely modest price. By the time appellant's case went to trial in 1986, appellant had recouped his investment some six times over.

Fairchild, the source of appellant's good fortune, had a son, Reddit Andrew Fairchild, more generally known as "Drew". With a partner named Bob Royals, Drew operated a business at the Hattiesburg Municipal Airport, in which, among other things, they serviced airplanes. In August 1980, Drew and Royals conspired with several others to pick up a load of marijuana in Colombia and fly it to the United States. Drew's and Royals' role was to provide confidential access to the airport and to refuel the plane. *See United States v. Royals*, 777 F.2d 1089 (5th Cir.1985). The conspiracy was brought to an abrupt halt by law enforcement officials who met the plane at the airport.

Despite Drew's admitted participation in the conspiracy, he was not indicted by a federal grand jury until March 29, 1985. The events which intervened were somewhat bizarre. Although Drew was not arrested at the scene of the crime, he was concerned that eventually he would be. Three of Drew's coconspirators were indicted by a federal grand jury on August 19, 1980, and, shortly thereafter, Drew sought legal help. He and attorney William Porter went to Forrest County District Attorney Paul ("Bud") Holmes to discuss Drew's situation, and Holmes sent them to United States Attorney George Phillips, who was overseeing the prosecution of the indicted conspirators. The end result of their meeting with Phillips was a "Memorandum of Understanding", executed on November 19, 1980, in which Drew agreed to plead guilty and to cooperate with the Government, in exchange for which the Government would recommend a five-year sentence with execution suspended and a $15,000 fine.

Porter then requested $10,000 in payment for his services. Upon Drew's refusal to pay, Porter commenced suit against him in March 1981. When Drew was questioned by his father, he told his father that he thought Porter had spent about twenty-five hours on his case. Unknown to Drew, his father then sent Porter a check for $2,669.19 on July 3, 1981. Porter insisted, however, that he was entitled to the full amount of his bill, and he complained to his friend Holmes about his inability to collect it. Concluding that an indictment of Drew would help bring about payment of the balance of Porter's fee, Holmes, after clearing the matter with United States Attorney Phillips, presented the case against Drew and a theretofore unindicted coconspirator, Robert Watkins, to a State grand jury. On August 26, 1981, the grand jury returned an indictment against both Drew and Watkins. On September 3, 1981, the day on which Drew was arraigned, his father gave Porter a check for $7,500.

Thereafter, Drew agreed to testify against Watkins in return for assurances from Holmes that he would receive five years probation and a $5,000 fine. On January 12, 1982, he pled guilty, and sentencing was scheduled for March 19, 1982. Because Drew was recovering from back surgery in March, his sentencing was continued to the July 1982 term. Thereafter, it was continued to the August term, to the November term, and then indefinitely. On December 23, 1982, Holmes moved successfully to have Drew's case "passed to the file", a procedure which places cases in an inactive status and generally results in their termination.

In Drew's case, however, the media, in his words, "made a big issue of it", and his case remained "in the file" for only three weeks. When Holmes was asked why this was so, he testified in part:

Well, because I had made the statement once Watkins [who had been a fugitive] got back I was going to open it up. That and the fact it was an awful lot of publicity on it, the television, newspapers had picked it up, they were talking about the fact this very wealthy, son of a very, very wealthy man in Hattiesburg, like his case had been swept under the rug, they were editorializing about it. I made the public statement that when we got Watkins got back up here I was going to

bring it back out of the file if we could get him.

Although the reinstated case was assigned to a different judge, Drew still was not called for sentencing. His case was continued through 1983 and 1984 and into March 1985, when the Forrest County Circuit Judge to whom the case had been reassigned announced that he would not honor Drew's plea agreement. Drew then was indicted in federal court, and, after pleading guilty, was sentenced to six months in prison.

When the FBI was informed of appellant's oil deal with Fairchild, it suspected that there might be an illicit relationship between it and the somewhat unusual treatment of Fairchild's son. It began an investigation which culminated in the presentation of evidence to a federal grand jury. Appellant voluntarily appeared and testified. The grand jury returned an indictment charging appellant with one count of bribery and three counts of perjury. He was acquitted on the bribery count and the first perjury count but was convicted on the remaining two counts of perjury.

The first count on which appellant was convicted was based on the following allegedly false testimony before the grand jury:

Q. The grand jury has heard evidence that the prosecutor, the state prosecutor, who eventually handled the case was an individual named Bud Holmes. Is he a friend of yours?

A. Very good friend of mine, long time friend, yes.

Q. Did he ever discuss the Drew Fairchild case with you?

A. No, not to the best of my recollection. I think I would recall if he had.

The second such count was based on the following testimony:

All right. Judge, do you have anything you want to add?

THE WITNESS:

Yes, I do.

I want to say this. I—Here (indicating) are your notes too, copies of your instruments, rather.

I came here voluntarily and am very happy to cooperate with this grand jury and give them all the information that I have and that I could. And I have always thought everyone should do that, and that goes for the grand jury over which I'm supervising right now, the other federal grand jury that's sitting at this time. I have nothing at all to—had nothing to hide or nothing to withhold and I brought everything that you asked me to bring.

And I want to say this. That I've been told and led to believe and read in the newspaper and heard on the news media so much about this is an investigation of the Drew Fairchild criminal case. Now, I have had nothing whatsoever officially or unofficially to do with the Drew Fairchild criminal case in federal court or state court. I don't need to reconstruct anything with reference to that. I've told you that from the beginning.

I have never talked to anyone about the case, any federal judge or state judge, federal prosecutor or state prosecutor, and I never handled any aspect of this case in federal court. As you said, Judge Cox handled it. I don't know where—someone told me maybe Judge Russell handled one of the other defendants also and—but I never handled any part of it, never had a thing to do with it at all, and never talked to anyone, state or federal, prosecutor or judge, in any way influence anybody with respect to this case. Didn't know anything about it until I read that account in the newspaper. Didn't even know Mr. Fairchild had a son when I was dealing with him in the business transaction.

So I want to say that because I understand that's what this is all about. The investigation is apparently, if the news media is correct, and if I understand it correctly, that's what this is about, the Drew Fairchild criminal case.

Some of the testimony offered by the Government in support of its claim that the foregoing testimony was false is substantially undisputed. It is undisputed that on one occasion, the exact date being unclear, appellant visited Wiley Fairchild in Fair-

child's office. Fairchild testified that he sought out appellant because appellant was a good friend of Holmes and Fairchild "wanted [appellant] to get Bud Holmes to do what he had promised to do." In response to questions by his own attorney, appellant summarized this portion of his conversation with Fairchild as follows:

Q. Did he ask you to do anything?

A. No.

Q. Did he discuss or you discuss with him in any way the case of Drew Fairchild?

A. No, I did not.

Q. Did you get the impression from him that he wanted you to say anything to anyone about it?

A. I got the impression that he wanted me to mention something about that to Bud Holmes.

Q. Did he make any request of you to do so?

A. No, he didn't.

It is undisputed that, following this conversation, appellant went to Holmes' farm. Holmes testified that he and appellant went there in Holmes' car; appellant said that he drove his own car. Holmes testified further that, en route to the farm, the following conversation took place:

We was riding up to pick up the turkeys, this would have to be 6, 6:30, 7 o'clock, riding out, and Judge Nixon told me, he said, Bud, I never would have asked you to do anything against your oath of office, never asked you to do anything embarrassing to you, wouldn't ask you to do anything wrong. I said, yes, sir. He said, I was out at Mr. Fairchild's and he asked me to put in a good word for his boy, or would I say something to you about Drew. —I think, I don't think he said Drew, I think he said his boy. I said, you know, well, I don't know. I don't know. What is it you want? You want an apology? I don't know. What does the man want?

Q. Are you saying did you say that to Judge Nixon?

A. Yeah, that was about my response. I can't remember this, because as I recall this was like in May of 82, you know,

when this occurred. But that was about my response, I mean, I was feeling rich and good-looking and, you know, that would have been my typical type answer.

He said I'm not asking you to do anything, I'm just saying that Mr. Fairchild asked me to put in a good word. Well, I knew Mr. Fairchild and the judge were kind of getting to be buddy-buddies there.

Q. How did you know that?

A. Pardon?

Q. How did you know that?

A. He had told me, or Carroll Ingram had told me that they were or he told me, could a come from Mr. Fairchild.

Q. Did he tell you why he'd called Mr. Fairchild?

A. He could have. I don't recall off hand, it seemed like he might have told, somewhere during the conversation I knew there was a chance he was going to make some more oil and gas investments with him. Seemed like he said maybe Mr. Fairchild said they were going to take a trip somewhere, you know, now what point in time, I don't remember but all this was, at that time it was nothing real important to me to really remember, so, don't hold me and say it occurred on that time but general impression I had was they got to be on a first name type basis and friendly. So, I took it on myself, said, well, judge, hell, I'm district attorney, I'll pass it to the files. And he said no, I'm not asking you to do that. Now, I'm not asking you to do anything now.

Holmes also testified concerning what transpired after he and appellant reached the farm:

Well, okay. We rode on out to the farm, got the turkey, went inside. I asked him to come in, have a drink.

Q. Whose house did you go to?

A. Go to mine, which was out in the Barrington community. We went inside. He said that he'd come in and have a drink, if I had some Royale Salute, that's kind of a joke between us, very expensive scotch whiskey, somebody gave it to me for Christmas a year earlier and I

said I did. He came in, we had a drink, probably had a couple of drinks, and I had told him that I had already had this arrangement worked out with Bill Porter, the man had the same agreement that the federal court had offered, which was probation and a fine, in return for his cooperation. He said do you mind if I call and tell Wiley? Or he could have said, Wiley, Mr. Fairchild. He said did he know? I don't know. I assume he did. Carroll Ingram sure knew it. And so he said do you mind if I tell him? I said no, I don't care.

So he called him and as I recall the conversation it's something like—

Q. Who made the telephone call?

A. Pardon?

Q. Who made the telephone call?

A. He did. And he told him, he said, I'm out at, said do you remember the man we were talking about today? I'm out at his farm and he tells me that your son isn't going to jail, which was true, you know, because of the plea arrangement and I just wanted to call and tell you that. And he thanked him, told him I appreciate you letting me make some of these investments, you know, with you, and he said, you know, the judge's salary and the number of children that I'm trying to educate and so forth, it was kind of hard and I do appreciate this opportunity.

And, with that, I told him, I said let me speak to him. And I picked the phone up and I said, Mr. Fairchild, I want to let you know, I hope you don't think there's anything personal about Drew and us and he said no, I never thought that. I'm real embarrassed about that and so forth and I take full blame here because Judge Nixon did not ask me to say or do this, but I told him, I said, I said I want to let you know that I want Judge Nixon to have credit for helping the boy. Of course I was misleading him because I already had the arrangement worked out with Bill Porter.

And I told him, I said I'm going to pass the case to the files. You know, I told Mr. Fairchild that. And that was, you know, basically the sum and substance of it.

Appellant's testimony corroborated that of Holmes in part and contradicted it in part:

Q. Tell us what happens.

A. Well, we were talking and this thing was just weighing on my mind what Mr. Fairchild had accused him of.

Q. Tell us what you said; what he said.

A. I said Bud, I've been talking to Wiley Fairchild. And I said he is accusing you of blackmailing him. He said—I said with reference to this matter some matter with his son. And—

Q. Did you mention to him—now listen to my question. You mentioned the blackmail. Did you mention to him at all how you understood he was being blackmailed?

A. Yes, what I understood by blackmail, Mr. Fairchild indicated to me talking about dragging the good Fairchild name through the mud in the news media.

Q. When you told that to Bud, what did he say? Tell us exactly what you remember him saying?

A. He said the son of a bitch is paranoid. He said everybody is after his money, he's got so much he'll never be able to spend it, he's crazy.

Q. What else did he say?

A. He said let me tell you about the case.

Q. What did you say?

A. Bud, I don't want to hear about the case.

Q. Let me stop you a second. Was there anything wrong in your hearing about the case?

A. No, I'd have been there all night because it takes Bud an hour to tell you what anybody else could tell you in a minute.

Q. Did you have any interest in hearing about the case?

A. No.

Q. When you told him that you didn't want to hear about the case, what did he say?

A. He said well, the thing's all worked out anyway. He said, I don't understand what he's talking about.

Q. Did he tell you anything else?

A. I don't recall that he did.

Q. Was there any—he told you when he said to you the thing's worked out, he doesn't know what he's talking about?

A. Yes.

Q. Did you say anything more than that to him?

A. No.

\* \* \* \* \* \*

Q. Coming back all seriousness while you're there listening to records having a drink and looking at the records, while he's making these calls, tell us what else occurs?

A. In a few minutes he said, called me over, judge come here a minute. He called me judge and I called him Bud. He handed me the telephone. He said here, talk to Wiley Fairchild.

Q. Go ahead.

A. So I took the phone and I told him hello and he said how are you judge, and I don't know whether Mr. Fairchild was half asleep or half drunk or what but he didn't sound just right. And he said I'm glad you mentioned that matter to Bud. He said I'm satisfied.

Q. Anything else?

A. No.

Q. What did you do with the phone?

A. I handed it back to Bud. When he handed it to me, he told me he wanted to talk to him again when I got off.

Q. Do you have any awareness at that point what Bud had said to Wiley before he handed you the phone?

A. No.

Q. What was your state of mind or how did you feel about Bud having made that call to Wiley?

A. Well, I was taken aback. I didn't know he was going to call Wiley Fairchild.

Q. Did Bud then speak to him for another minute or two?

A. I guess so. I handed him the phone and walked back over by the records. I was disgusted.

Q. Did you say anything to Bud after he got off the phone?

A. Yeah, I said Bud, why did you call Wiley and what did you say to him. He said I just wanted to get the damn thing straightened out.

Q. That's it?

A. That's all.

Unfortunately for appellant, Holmes' testimony concerning the telephone call to Fairchild was corroborated by Fairchild himself:

Q. Okay. Did you have subsequent contact with Judge Nixon about your meeting?

A. He called me that night just about seven o'clock.

Q. What did he say?

A. He said Wiley, you know that man we was talking to this evening? I said yeah. He said well, I'm in his home, and everything going to be taken care of to your satisfaction. I says thank you, I appreciate that.

Q. Did you recognize the voice at the other end?

A. Yeah.

Q. Did he identify himself?

A. No.

Q. How did you recognize his voice?

A. I just can recognize voices.

Q. What followed that conversation with Judge Nixon?

A. Bud got on the phone, Bud Holmes.

Q. And did you recognize his voice?

A. Oh, yeah. Yeah.

Q. What did he say to you?

A. He said Wiley, when this man asks me to do something, I don't ask no questions, I just go ahead and do it.

Q. What did you say?

A. I said thank you, Bud, I appreciate that.

Q. Was there any further conversation?

A. No.

Q. What's the next thing that you recall happening in your son's case?

A. Well, it was later passed to the file.

Holmes' testimony also was substantially corroborated by Carroll Ingram:

Q. ... [Wiley Fairchild] mentioned to you that he had asked something of Judge Nixon in terms of asked him to speak to Bud Holmes, correct?

A. Yes, he asked to—

Q. I beg your pardon. Go ahead.

A. Yes, he said that he asked Judge Nixon to speak to Bud Holmes.

Q. And that it was about the case?

A. And it was about Drew Fairchild's case.

Q. And that's as far as you went. You know nothing more than from Wiley Fairchild about it, correct?

A. I know that Wiley Fairchild told me that Judge Nixon confirmed that he had spoken to Bud Holmes about the case.

Q. Excuse me. Judge Nixon confirmed that to you yourself?

A. Certainly he did.

\* \* \* \* \* \*

Q. In fact, Judge Nixon had volunteered to you that on one occasion he had in fact, at Wiley Fairchild's request, spoke about Drew Fairchild to Bud Holmes?

A. He certainly had, absolutely.

■ To obtain a perjury conviction, the Government must prove that the defendant's statements were material, that they were false, and that, at the time they were made, the defendant did not believe them to be true. *United States v. Fulbright*, 804 F.2d 847, 851 (5th Cir.1986). The materiality of appellant's challenged grand jury testimony was a question of law for the trial judge. *United States v. Thompson*, 637 F.2d 267, 268–69 (5th Cir.1981). Appellant does not challenge the correctness of the district judge's holding that the subject matter of appellant's testimony was material to the grand jury's investigation.

■ The evidence on the remaining issues must, of course, be viewed in a light that is most favorable to the Government, with all reasonable inferences and credibility choices made in support of the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Lamp*, 779 F.2d 1088, 1092 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986). The standard is the same whether the evidence is direct or circumstantial. *Glasser, supra*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Escobar*, 674 F.2d 469, 477 (5th Cir.1982). We did not see or hear the witnesses testify; the jury did. After viewing the cold and impersonal record in the light most favorable to the Government, we must affirm if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see United States v. Shaw*, 701 F.2d 367, 392 (5th Cir.1983), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). This is so because a jury may choose its verdict among reasonable constructions of the evidence so long as the evidence establishes guilt beyond a reasonable doubt. *United States v. Thomas*, 768 F.2d 611, 614 (5th Cir.1985) (*quoting United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)). Viewing the evidence in the manner above described, we can reach no other conclusion save that it warranted the jury in finding that appellant's testimony was false.

The jury also could properly find that appellant knew his testimony was false. Such knowledge can be, and usually must be, proved from circumstantial evidence. *See United States v. Caucci*, 635 F.2d 441, 444 (5th Cir.), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981). Holmes testified on behalf of the Government that, during the FBI's investigation, appellant called him and said that he had told the investigators that "he never talked to anyone at anytime about the case." Appellant subsequently made the same statement to Holmes in a face-to-face meeting, and then asked Holmes to find out whether appellant's telephone conversation with Fairchild from the farm had been taped. It had not. A reasonable jury could conclude from these conversations that appellant

was planning to hide the true facts from the grand jury and was soliciting Holmes' support. *See United States v. Abrams*, 568 F.2d 411, 419 (5th Cir.), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).

There is no merit in appellant's belated attempt to argue ambiguity. There certainly is no ambiguity in the question, "Did [Holmes] ever discuss the Drew Fairchild case with you?". This was not a question that required a recollection covering a full lifetime, but necessarily was limited to the period following Drew's indictment and Holmes' retirement from office in 1984. Its clarity was amply demonstrated by appellant's voluntary comments that followed, in which he said that he had read in the newspapers that "this is an investigation of the Drew Fairchild criminal case", and that he "didn't know anything about it until [he] read that account in the newspaper"; that he had "never talked to anyone, state or federal, prosecutor or judge, in any way influence anybody with respect to this case." The record shows that appellant answered the question without hesitancy, evasion, or qualification. *United States v. Caucci, supra*, 635 F.2d at 445. If in the natural meaning in the context in which his words were used they were materially untrue, perjury was established. *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976).

There was no need for the district court to define the word "discuss" for the jury. "[W]ords that are clear on their face are to be understood in their common sense and usage." *United States v. Fulbright, supra*, 804 F.2d at 851. Appellant's counsel had no hesitancy in using the same word in questioning his client; *e.g.*, "Did he discuss or you discuss with him in any way the case of Drew Fairchild?"; "What if any discussion do [sic] you have with him at that time?".

We also conclude that appellant's reliance on *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), is misplaced. In *Bronston*, the Supreme Court held that the federal perjury statute does not reach a literally true but unresponsive answer, even if the witness intended to mislead his questioner and even if the answer was arguably false by negative implication. Appellant argues that the prosecutor could not have intended his question to refer to the discussion appellant did have with Holmes, because the prosecutor knew nothing about the discussion until after appellant testified. For this reason, appellant argues, the prosecutor's question was impermissibly vague and imprecise under the rationale of *Bronston*. We find this argument unpersuasive. The purpose of a grand jury inquiry is to discover whether a crime has been committed and, if so, who committed it. *In re Marc Rich & Co., A.G.*, 707 F.2d 663, 665–66 (2d Cir.), *cert. denied*, 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983). *Bronston* does not require that a prosecutor know how a defendant will answer a question before he asks it.

■ Appellant makes numerous allegations of prosecutorial misconduct, which are not of significant merit, separately or collectively, to require individualized discussion. We see no prejudicial improprieties in the Justice Department's interview of appellant during its preliminary investigation, the tape of which was placed in evidence by the defense. No objection concerning alleged grand jury abuse was made below, and no meritorious objection has been made to this Court. *See United States v. Calandra*, 414 U.S. 338, 343–45, 94 S.Ct. 613, 617–18, 38 L.Ed.2d 561 (1974); *United States v. Brown*, 574 F.2d 1274, 1275–77 (5th Cir.), *cert. denied*, 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978). *See also United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). There is no merit in appellant's contention that the bribery count was insufficient as a matter of law. "An indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). Appellant did not move for severance of the bribery count. Since the proof on all four counts was

necessarily intertwined, no prejudicial error resulted from the fact that they were tried together. *United States v. Duzac*, 622 F.2d 911, 913 (5th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980); *see United States v. O'Connell*, 703 F.2d 645, 648–49 (1st Cir.1983).

Appellant grasps at straws in arguing that the prosecutor misstated the evidence he proposed to produce when he opened to the jury and misstated the evidence actually produced when he summed up. In evaluating allegations of such prosecutorial misconduct, the "test ... is whether the remarks were improper and whether they prejudicially affected substantial rights" of the defendant. *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir.1981); *see Darden v. Wainwright*, — U.S. —, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). We have carefully reviewed the prosecutor's comments in the context of the entire case, including the district court's admonishments to the jury that statements by counsel were not evidence, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *United States v. Cardenas*, 778 F.2d 1127, 1130–31 (5th Cir. 1985), and we are completely satisfied that they pass this test. In view of the complete lack of merit in appellant's argument, we see no need for a more detailed discussion.

■ Appellant's contention that he was denied due process and a fair trial because all of the requested information in his demand for a bill of particulars was not furnished, is without substance. The purpose of a bill of particulars is to minimize surprise by giving "sufficient notice of a charge for its defense." *United States v. Carlock*, 806 F.2d 535, 550 (5th Cir.1986). A district court's decision to deny demanded particulars is a discretionary one which will not be reversed absent a showing of surprise and substantial prejudice. *Id.* Appellant has made no such showing.

■ Equally without substance is appellant's claim that he was prejudiced by the district court's "erroneous" refusal to dismiss the bribery charge at the conclusion of the proof. In response to appellant's motion for acquittal, the prosecutor pointed out that appellant had already made $50,-000 profit "with more to come" on a $9,000 investment, and that there was ample evidence that appellant had rendered assistance to his benefactor's son. There was also proof in the case that the documents evidencing appellant's oil property investment had been backdated, so that they antedated the aborted drug conspiracy by approximately six months, and that the name of the grantee was withheld from Fairchild's employee who prepared the deeds of conveyance. Despite this evidence, the jurors rejected the Government's claim of bribery. This does not mean, however, that they should not have been permitted to consider it. In any event, appellant has not shown that the denial of his motion tainted the jury's consideration of the three perjury counts, on one of which appellant was acquitted. *See United States v. Zicree*, 605 F.2d 1381, 1388–89 (5th Cir.1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980).

Appellant's unspecified and unsubstantiated claims of evidentiary error do not merit discussion. Neither does appellant's claim of error in the court's denial of his motion for a new trial on the ground of "newly discovered evidence." The district court gave careful consideration to the alleged newly discovered evidence, which was addressed to the date of appellant's conversations with Fairchild and Holmes. It held that, to a large extent, the evidence was not credible and that, in any event, it was not probative of meaningful error in the date which Holmes had assigned. We agree.

The judgment of conviction is affirmed.