**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William M. ABROMS, Defendant–**
**Appellant.**

**No. 90–5644.**

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1991.

As Amended on Denial of Rehearing
Dec. 18, 1991.

Randall B. Wilhite, Looper, Reed, Mark & McGraw, Houston, Tex., for defendant-appellant.

W. Ray Jahn, LeRoy M. Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, DAVIS, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

William M. Abroms challenges his perjury conviction, primarily contending that the evidence was insufficient and that his testi-

mony before the grand jury, on which he was convicted, was not material to its investigation. We AFFIRM.

## I.

In the spring of 1988, Danny Gonzalez and Leo Ladouceur, San Antonio, Texas, businessmen, purchased a large share of the stock in Suburban Savings Association (Suburban), a San Antonio savings and loan. Because the purchase gave Gonzalez and Ladouceur control of Suburban, they were required by the Federal Home Loan Bank Board (FHLBB) to obtain its approval of the purchase. Gonzalez discussed this with Darrell Tomblin, a Florida businessman, who told him that he had political influence through United States Senator Jacob Hecht and Senator Hecht's administrative assistant, Glen Mauldin, which could be used to expedite the approval. He told Gonzalez that in exchange for this influence, Gonzalez would have to make a $70,000 contribution to Senator Hecht's re-election campaign.

At this time, the FBI was investigating Tomblin's and Mauldin's activities. In June 1988, the FBI began surveillance of Ladouceur, a cooperating government witness. On several occasions, a body recorder was used by Ladouceur during meetings. The investigation also involved tapping the telephones of Tomblin (at his restaurant and residence) and one of his business associates.[1]

Tomblin, with Mauldin's assistance, arranged a meeting between Gonzalez and the then chairman of the FHLBB, Danny Wall. Before that meeting, Tomblin had Mauldin fly to San Antonio and told Gonzalez that Mauldin was to receive ten percent of any of the group's business ventures. A meeting took place on June 2, 1988, attended by Mauldin, Ladouceur, Gonzalez, Tomblin, Tomblin's partner Robert DeJonge, and Abroms, a New Orleans businessman and business associate of Tomblin's for twenty-five years. Ladouceur was wearing a body recorder during this meeting. Among other things, the group discussed using influence through Senator Hecht's office to obtain expedited FHLBB approval, the upcoming meeting in Washington, D.C. with FHLBB Chairman Wall, acquiring ten other savings and loans in which Abroms was to be a joint owner, and Abroms' finding investors for Suburban.

On June 8, those in attendance at the June 2 meeting went to Washington, D.C., to meet with Vince Lachelli, a lobbyist hired by the group. That night, Abroms, Ladouceur, Tomblin, and Mauldin met and again discussed using political pressure on the FHLBB through Senator Hecht's office. This meeting was recorded.

The following day, the group met with Senator Hecht. Next, they met with Chairman Wall and his assistant to discuss the change of control of Suburban and a bond program advocated by Gonzalez. The group went back to meet with Senator Hecht. After this trip, Gonzalez maintained contact with Abroms regarding the acquisition of the ten savings and loans.

Other business plans developing during this time concerned importing products from Grenada and the purchase and sale of an oil refinery in Grenada. In July, Gonzalez traveled to Sarasota, Florida, to meet with Tomblin, Lachelli, and Ladouceur at Tomblin's restaurant. A recorded conference call was held with Abroms, during which the group discussed obtaining a letter from Senator Hecht's office to the FHLBB, encouraging Chairman Wall to approve Gonzalez's bond program and Abroms' sitting on the board of the ten savings and loans.

Tomblin telephoned Abroms later in July and explained a plan to convert about thirty billion pesos into United States dollars for use as equity capital in buying savings and loans. He later informed Abroms that Senator Hecht's office was exerting influence to make the plan a success. Abroms located a bank capable of changing the pesos; but, the project was abandoned. These conversations were also recorded.

In other recorded telephone conversations, Tomblin continued to keep Abroms abreast of the efforts to gain FHLBB ap-

---

1. Between June 1 and September 1988, several thousand conversations were recorded.

proval for Gonzalez's takeover. He informed Abroms of the political pressure being applied on Wall and that Tomblin's $250,000 debt to Gonzalez would be cancelled if he succeeded. In early August, Tomblin told Abroms that although the FHLBB's Dallas office had not approved the takeover, approval by the Washington office could still be arranged. Tomblin also told Abroms that Ladouceur had been arrested a week earlier by the FBI. Abroms responded, "He scared me too much.... I thought he'd put us all in jail." Tomblin replied, "he could if you're not careful, his mouth, you know talking too much."

On September 6, Abroms and Tomblin traveled to Louisiana State University (LSU) in Baton Rouge to obtain several faculty members' assistance in the Grenada business venture. At this meeting, Tomblin mentioned Senator Hecht's and Mauldin's interest in the project and the availability of federal funding. And, on September 8, Tomblin, while in Washington, D.C., made three recorded calls within an hour and a half of each other to Abroms. They discussed the LSU meeting and an upcoming meeting with the Prime Minister of Grenada. Tomblin stated that Abroms would handle the taxes and establish the corporation, Tomblin would handle the "politics", Gonzalez would handle the "up front financing", and Lachelli would help with the "politics" and Grenada. Abroms volunteered to continue to work with LSU. Tomblin and Abroms discussed Mauldin's role in the venture; and Tomblin stated, "I'm gonna tell Glen again, ... for that ten percent, we wanta see performance. I wanta see the approval of the grants for the university."

On September 9, a meeting was held in Washington, D.C. with the Prime Minister of Grenada. Gonzalez, Ray Stancil (an oil refinery expert), Tomblin, Lachelli, and Mauldin attended and discussed construction of the refinery. On September 12, in another recorded telephone conversation,

Tomblin called Abroms about the September 9 meeting, which Tomblin described as "great". He told Abroms that a trip to Grenada was planned and that "Glen" (Mauldin) attended the meeting. They also discussed Stancil's presence at the meeting, and the possibility of obtaining crude oil from Mexico to feed the Grenada refinery. Later that same afternoon, Abroms and Tomblin discussed obtaining Senator Hecht's influence to forgive some of Mexico's foreign debt in exchange for crude oil for their refinery.

On September 15, 20, and 21, 1988, the FBI interviewed Mauldin, Lachelli, and Tomblin respectively. Tomblin telephoned Abroms to discuss each of these interviews and Ladouceur's arrest. And, again, these conversations were recorded.

Abroms appeared before a grand jury on April 5, 1989, and denied any knowledge of a ten percent interest being offered to Mauldin. He also denied any recollection of Senator Hecht's or Mauldin's names being mentioned at the LSU meeting. When asked about the meeting with the Prime Minister of Grenada, Abroms stated that he was not there and denied any knowledge of who else attended. When asked if Tomblin had discussed the meeting with him, Abroms said "He may have mentioned it. It just wasn't germane as to what I was doing."

In his testimony before the grand jury the following day, Abroms denied any knowledge of the July 1988 letter from Senator Hecht's office to the FHLBB. He also denied any knowledge of political influence used to help Gonzalez and Ladouceur gain control of Suburban and claimed to have only recently learned of Ladouceur's arrest and indictment.

On September 13, 1989, Tomblin, Mauldin, and Lachelli were indicted for conspiracy, use of interstate facilities in aid of racketeering, and bribery. That same day, Abroms was indicted for five counts of making false statements before the grand jury, in violation of 18 U.S.C. § 1623.[2] A

---

2. The indictment charged that Abroms knowingly made false and material statements regarding Mauldin's ten percent interest (count 1), the

LSU meeting (count 2), the plan to convert pesos to United States dollars (count 3), Tomblin's efforts to influence the FHLBB (count 4),

trial in January 1990 resulted in a hung jury. In March 1990, a superseding indictment was returned, with a new count 5. The new count charged Abroms with knowingly making false and material statements regarding his knowledge of the meeting with the Prime Minister of Grenada. A trial in May 1990 resulted in a conviction on count 5, an acquittal on count 2, and a mistrial on the other counts. The mistried counts were later dismissed without prejudice by the government. Abroms was sentenced to twelve months' imprisonment, followed by three years' supervised release, and fined $5,000.

## II.

Abroms contends that the evidence was not sufficient to convict him of knowingly making a false statement while testifying before the grand jury; that the answers he gave, that are the basis for count 5, were not material to the grand jury's investigation; and that the district court erred in admitting testimony regarding conversations to which he was not a party, in not admitting recorded conversations in their entirety, and in denying his motions to reconsolidate his suppression hearing and to suppress the taped conversations.

■ Section 1623 provides in part that "[w]hoever under oath ... in any proceeding before or ancillary to any ... grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1623(a). And, it further provides that "[p]roof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence." 18 U.S.C. § 1623(e). The statute "subjects any person who knowingly makes a 'false material declaration' ... to a penalty of perjury." *United States v. Salinas*, 923 F.2d 339, 340 (5th Cir.1991) (citing *United States v. Nixon*, 816 F.2d 1022, 1029 (5th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762

and Abroms' knowledge of Ladouceur's 1988

(1988)). "[I]n order to obtain a conviction for perjury, the Government must prove that the statements made by the defendant were (1) false, (2) material, and (3) not believed by the defendant to be true." *Id.* (citing *Nixon*, 816 F.2d at 1029).

## A.

■ Abroms' conviction, for which he maintains there was insufficient evidence, was based on the following exchange:

Q. We have been informed that there was, in fact, a meeting like two or three days after the LSU meeting at the Grenadian Embassy in Washington, D.C.

A. Could very well be. I wasn't there.

Q. Okay. You were not there?

A. No.

 * * * * * *

Q. Do you know who else might have attended that meeting?

A. <u>No, sir.</u>

Q. Did you ever have an occasion to discuss it with your other partners, with Mr. Tomblin or Mr. Lachelli as to whether or not there was such a meeting and who was there?

A. <u>He may have mentioned it. It just wasn't germane as to what I was doing.</u>

(Underlined in indictment.) The underlined answers in the indictment were charged to be part of material testimony and to be knowingly false. Abroms contends that these responses were "literally true". In *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), the Supreme Court held that the perjury statute does not apply to a literally true but unresponsive answer. However, " 'an answer that is responsive and false on its face does not come within *Bronston*'s literal truth analysis simply because the defendant can postulate unstated premises of the question that would make his answer literally true.' " *United States v. Fulbright*, 804 F.2d 847, 851 (5th Cir.1986) (quoting *United States v. Cuesta*, 597 F.2d

indictment (count 5).

903, 920 (5th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 377 (1979)).

Of course, in reviewing the sufficiency of the evidence, we view it in the light most favorable to the government and with all reasonable inferences and credibility choices made in support of the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The inquiry is whether any reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

As part of the evidence, the jury heard a recording of Abroms' grand jury testimony and recordings of telephone conversations and meetings, including Abroms' telephone conversation with Tomblin three days after Tomblin, Mauldin, Stancil, and others met with the Prime Minister of Grenada. As noted, during that conversation, Abroms was told that "Glen" (Mauldin) and Stancil attended the meeting. There is sufficient evidence to support the jury's finding that the answers were false and that he knew that they were false. For example, prior to the meeting with the Prime Minister, Abroms and Tomblin discussed what Mauldin was to do to earn his ten percent in the venture and Abroms' interest in the project. However, before the grand jury, and in response to being asked whether he had ever discussed that meeting with Tomblin or Lachelli, Abroms responded that "He may have mentioned it. It just wasn't germane as to what I was doing." And, immediately before that exchange, Abroms denied knowing "who else might have attended that meeting." This was contrary to the recorded conversation, played to the jury, in which Tomblin told Abroms that "Glen" and Stancil attended. Admittedly, the reference to "Glen" in the conversation was

very brief. Moreover, the conversation took place almost seven months before Abroms testified before the grand jury. But, these were among the many mitigating factors fully aired for the jury at trial. It goes without saying that these were among the factors for it to weigh and consider.

### B.

To support a perjury conviction, the government must prove that Abroms' statements were, at the time made, material to the grand jury proceeding in which they were made. *United States v. Holley,* 942 F.2d 916, 923 (5th Cir.1991) (citing *United States v. Gremillion,* 464 F.2d 901, 904–05 (5th Cir.), *cert. denied,* 409 U.S. 1085, 93 S.Ct. 683, 34 L.Ed.2d 672 (1972)). "Materiality is a legal question to be decided by the court and is not an issue for the jury to determine." *Id.* (quoting *Gremillion,* 464 F.2d at 905). But because it is a legal question, "we review the district court's materiality finding *de novo.*" *Salinas,* 923 F.2d at 340.

### 1.

Although Abroms acknowledges that materiality is a legal question, he nevertheless maintains, erroneously, that the government must prove materiality—a legal question—beyond a reasonable doubt. He bases this contention on materiality being one of the elements of the offense. In *United States v. Hausmann,* 711 F.2d 615 (5th Cir.1983), this court addressed this same contention, concerning the standard of proof *vel non* for determining materiality under 18 U.S.C. § 1001 (false statement statute).[3] It held that materiality was a legal question and that "[a] standard of proof ... has no application to the legal question whether a given statement is ma-

---

**3.** 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false,

fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

terial." 711 F.2d at 617.[4] Obviously, the same reasoning applies for § 1623 purposes. In fact, in so holding, the *Hausmann* court relied upon cases from the Sixth and Seventh Circuits reaching the same holding for § 1623 cases, as discussed *infra,* including in note 5. The earlier referenced "proof beyond a reasonable doubt" language in § 1623(e) notwithstanding, seven other circuits have held that for § 1623, materiality need not be established beyond a reasonable doubt.[5] Materiality is a legal question. As stated by the Seventh Circuit, relied upon by this court in *Hausmann,* 711 F.2d at 617–18, "[a]s a question of *law,* there cannot appropriately be *any* evidentiary or factual burden with respect to the issue of materiality. A question of law is by definition susceptible of only two answers: 'yes,' the requirements of legal principles are met or 'no,' they are not met." *United States v. Watson,* 623 F.2d 1198, 1202 (7th Cir.1980) (emphasis in *Watson*).

### 2.

As noted, because materiality is a legal question, the district court's ruling on it is reviewed *de novo.* In *Hausmann,* after holding that materiality was a legal question, 711 F.2d at 617, this court stated:

"There is another side to this coin. As a question of law, the trial court's materiality finding is fully reviewable on appeal. We disavow any notion that it is shielded by the clearly erroneous rule." *Id.* at 618. The district court concluded that it was material to the grand jury's investigation to determine the nature and extent of Abroms' knowledge of the business activities of Tomblin, Lachelli, and Mauldin, the ownership interest promised to Mauldin in those business activities, the efforts made by Tomblin to obtain political influence with the FHLBB through the use of Mauldin and Senator Hecht's office, the efforts of Tomblin and Mauldin to obtain financing from the United States for their business activities, and the knowledge of Tomblin, Lachelli, Mauldin, and Abroms concerning the scope of the FBI investigation into their activities.

This ruling was based, *inter alia,* on a review of the transcript of Abroms' grand jury testimony and that grand jury's contemporaneous indictment of Tomblin, Mauldin, and Lachelli. Abroms maintains that the transcript of the entire grand jury proceedings, and/or the testimony of the investigating attorney and jury foreperson should have been used to show materiality. "In the usual perjury case, the Government

4. *Hausmann* provides that "materiality is ultimately a question of law and must be decided by the court," 711 F.2d at 616, even though "[w]hether a statement is material rests on a factual evidentiary showing," *id.,* and is an element of the offense. The court's analysis is most thorough and enlightening. It includes a discussion of the seminal decision for this rule, *Sinclair v. United States,* 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929), concerning testimony before a committee of the United States Senate about the Teapot Dome scandal. As noted, Abroms does not contend that materiality is not a legal question.

5. *See United States v. Martinez,* 855 F.2d 621, 623 (9th Cir.1988) ("Since materiality is a legal question, the government need not prove it beyond a reasonable doubt" for a perjury conviction.); *United States v. Farnham,* 791 F.2d 331, 334 (4th Cir.1986) ("While the government must establish a nexus between the investigation and the false declaration, it need not prove the connection beyond a reasonable doubt."); *United States v. Larranaga,* 787 F.2d 489, 496 (10th Cir.1986) ("Since materiality is a question of law ... there was no burden to prove that element beyond a reasonable doubt" in a § 1623 case.);

*United States v. Armilio,* 705 F.2d 939, 941 (8th Cir.) ("The standards of proof for making findings of fact are, however, simply irrelevant to the determination of materiality" under § 1623.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983); *United States v. Berardi,* 629 F.2d 723, 727 (2d Cir.) (Although the government bears the burden of demonstrating materiality in a § 1623 case, "it need not be established beyond a reasonable doubt."), *cert. denied,* 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980); *United States v. Watson,* 623 F.2d 1198, 1201 n. 6 (7th Cir.1980) (There is no indication that § 1623(e) which requires proof beyond a reasonable doubt "applies to more than just the elements of the crime which are to be submitted for jury determination."); *United States v. Giacalone,* 587 F.2d 5, 7 (6th Cir.1978) ("Since the issue of materiality is a legal question, not a question of fact, the government need not prove materiality beyond a reasonable doubt" in a perjury case.), *cert. denied,* 442 U.S. 940, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979). In *Hausmann,* this court relied upon *Watson* and *Giacalone.* 711 F.2d at 618.

meets its burden of proof either by entering the transcript of the prior proceedings into evidence, or by presenting testimony from persons who witnessed the proceedings." *United States v. Damato,* 554 F.2d 1371, 1373 (5th Cir.1977) (footnotes omitted). As noted, § 1623 does not require that "proof be made by any particular number of witnesses or by documentary or other type of evidence." 18 U.S.C. § 1623(e). However, "[w]hile this court has never stated that only certain types of evidence may be used to prove materiality, we have generally looked with disfavor on prosecutions brought under Section 1623 that have not used complete transcripts or testimony of members of the grand jury." *United States v. Cosby,* 601 F.2d 754, 757 (5th Cir.1979).

In *United States v. Thompson,* 637 F.2d 267 (5th Cir.1981), we held that the government satisfied its burden of proving materiality by introducing the indictment brought against the individual who had been investigated by the grand jury, the testimony of a witness to the proceedings, and the transcript of the defendant's testimony before the grand jury. *Id.* at 269. "While an indictment brought by the same grand jury may not always prove the scope of the investigation, the [Tomblin, Mauldin and Lachelli] indictment did." *Id.* at 269. Moreover, the "probative value of the indictment was buttressed by" the complete transcript of Abroms' testimony before the grand jury. *Id.* at 270.

### 3.

 The test for materiality is " 'whether the false testimony was *capable* of influencing the tribunal on the issue before it.' " *Salinas,* 923 F.2d at 341 (emphasis in *Salinas* ) (quoting *United States v. Giarratano,* 622 F.2d 153, 156 (5th Cir. 1980)). Abroms contends that his testimony was not material, because it was "manifestly incapable of influencing the Grand Jury." As noted, "a concealment or misrepresentation is material if it 'would have the natural effect or tendency to influence' the decision of the tribunal to which it is addressed." *Holley,* 942 F.2d at 923 (quoting *Salinas,* 923 F.2d at 341). "The state-

ments need not be material to any particular issue, but may be material to collateral matters that might influence the court or the jury in the decision of the questions before the tribunal." *Damato,* 554 F.2d at 1373.

 The indictment against Tomblin, Mauldin, and Lachelli sets out the scope of the grand jury's investigation. For example, count 1 charges them with conspiracy

> to defraud the United States of its right to the honest, faithful, and impartial services of its employee, Glen N. Mauldin, and to have the functions of the United States Senate and the Federal Home Loan Bank Board administered honestly, fairly, impartially, free from abuse, free from corruption, free from self dealing and free from corruptly induced political influence.

The indictment charges that, as part of this conspiracy, Mauldin, in his position as Senator Hecht's Administrative Assistant, attended a meeting with the Prime Minister to further the business ventures in Grenada. And, it charges Mauldin with directly and indirectly corruptly asking, soliciting, seeking, accepting, and agreeing to receive ten percent interest in business ventures involving the acquisition of investments in Grenada.

In light of this investigation, Abroms' testimony was most capable of influencing the grand jury. Truthful answers may have resulted in further questions regarding the extent of his knowledge and its source. For example, had Abroms testified truthfully that he understood, or was told, that Mauldin attended the meeting, further questions could have been asked, including why Mauldin, a Senator's aide, would have been there, as well as what his personal involvement or stake was.

### C.

 Abroms contends that part of the government's evidence, including some of Gonzalez's testimony, was hearsay or, in

the alternative, irrelevant.[6] He maintains that admission of this testimony constituted reversible error, because it referred to criminal activity "in which Mr. Abroms was in no way connected." As stated, Abroms was indicted on five counts. The government's evidence at trial was directed toward obtaining convictions on all five. Therefore, evidence was presented regarding not only Abroms' knowledge about the September 9 meeting with the Prime Minister (count 5), but also about Mauldin's ten percent interest (count 1), the LSU meeting (count 2), the plan to convert pesos to United States dollars (count 3), and Tomblin's efforts to influence the FHLBB (count 4).

■■■■ Needless to say, the admissibility of evidence is a matter within the discretion of the trial court. Fed.R.Evid. 103; *e.g.*, *United States v. Pretel*, 939 F.2d 233, 239 (5th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 327, 116 L.Ed.2d 267 (1991). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). A statement offered for a purpose other than establishing the truthfulness of the assertion is not hearsay. *E.g.*, *United States v. Vizcarra–Porras*, 889 F.2d 1435, 1439 (5th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 2192, 109 L.Ed.2d 520 (1990). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401.

■■■■ Abroms challenges the district court's admission of evidence regarding the following: (1) a meeting where Tomblin told Gonzalez that he had friends, senators, and other politicians in Washington, D.C. that could assist Gonzalez to obtain a thirty-day turnaround on the FHLBB approval; (2) discussions about obtaining political in-

fluence over Mexican government officials; (3) a meeting of Tomblin, Gonzalez, and Mauldin at which Mauldin agreed to help in obtaining timely review of Gonzalez's FHLBB application if Gonzalez would make a $70,000 political contribution; and (4) a meeting in Sarasota during which the participants discussed Mauldin's receiving ten percent of some of the business ventures in exchange for his assistance in the ventures while in public office. Abroms maintains that because he was not present at these meetings, this evidence was irrelevant. In the alternative, he contends that it was unfairly prejudicial and therefore should have been excluded under Fed. R.Evid. 403. We disagree.

Following the testimony regarding the meeting between Tomblin and Gonzalez, the district court gave the following limiting instruction:

> [W]e're not concerned with whether what was said is true or not but it just gives you an idea of what the person that said it might have been thinking at the time that he said [it], so we're not saying that what was said is absolutely true or not but [it] gives you an idea what he was thinking and for that purpose, to show his state of mind, this evidence is coming in.

The testimony regarding discussions about obtaining political influence over Mexican government officials was admitted to verify that the conversations later repeated to Abroms had occurred. Following the testimony regarding the meeting between Tomblin, Gonzalez, and Mauldin, the district court gave the following limiting instruction:

> When you hear these conversations that go on with regard to this, I think an important factor is was Mr. Abroms there and can you attribute what went on to him? Obviously if he was there, he might know. If he wasn't there, then you might suspect that he didn't know but it might help you in other ways to

---

**6.** Abroms also contends that the district court erred in allowing the prosecutor to argue to the jury that these conversations formed the factual background from which the jury should convict Abroms. However, Abroms did not contemporaneously object. (He did, however, raise the issue in his motion for new trial.) We do not find plain error; his substantial rights were not affected. *See* Fed.R.Crim.P. 52(b).

determine what knowledge he had about the circumstances and all so that's an important factor that maybe you should keep in mind as we go through the case and hear the evidence.

The testimony regarding the Sarasota meeting was admitted to show Abroms' knowledge and state of mind regarding Tomblin's statement to him that "I'm gonna tell Glen again, . . . for that ten percent, we wanta see performance."

The testimony which Abroms challenges was not hearsay. The district court repeatedly gave limiting instructions that the conversations were not admitted to prove the truth of the matters asserted. And, the information elicited was certainly relevant, including as to Abroms' state of mind. We find no error.

### D.

Abroms sought unsuccessfully to have complete recorded conversations, instead of only the portions selected by the government, played for the jury. Prior to the first tape being played, he contended that "[t]o pull out just a thirty minute portion [of the tapes] . . . is unfair because [Abroms] had to sit through and listen to the whole meeting all day long."

 Fed.R.Evid. 106 provides that "[w]hen a . . . recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part . . . which ought in fairness to be considered contemporaneously with it." In reviewing for an abuse of discretion by the district court concerning Rule 106, we are more than mindful that it also "has discretion to conduct the trial in an efficient and orderly manner in the admission or exclusion of evidence." *United States v. Livingston,* 816 F.2d 184, 190 (5th Cir.1987). Abroms wanted the jury to compare the length of the excerpted

portions to the length of the entire conversations. However, this goal could have been attained through testimony of the witnesses who prepared the recordings. Indeed, it was elicited about the first tape. The district court did not err in denying Abroms' request to play the tapes in their entirety to the jury. But, even assuming error, it did not affect Abroms' substantial rights. Fed.R.Evid. 103(a); Fed.R.Crim.P. 52(a).

### E.

Finally, Abroms contends that the district court erred by (1) denying his Motion to Reconsolidate and Continue his suppression hearing and (2) denying his Motion to Suppress the tape recordings.[7] In support, however, he only summarily states that "[t]he reasons that the trial court should have granted these Motions are set forth in such Motions and on the record during the suppression hearing."

 The "contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on" must be included in the appellant's brief. Fed.R.App.P. 28(a)(4). Because Abroms failed to do so, we do not consider this issue. *E.g., United States v. Lindell,* 881 F.2d 1313, 1325 (5th Cir.1989), *cert. denied,* 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1056 (1990); *United States v. Kim,* 884 F.2d 189, 195 (5th Cir.1989). It "would be patently unfair to the [government] for this court to consider this issue as properly before it." *Cannon v. Teamsters & Chauffeurs Union,* 657 F.2d 173, 178 (7th Cir.1981); *see Thys Co. v. Anglo Cal. Nat'l Bank,* 219 F.2d 131, 133 (9th Cir.) ("The purpose of the requirements in respect of briefs is to conserve the time and energy of the court and clearly to advise the opposite party of the points he is

---

7. As noted, Tomblin, Mauldin, and Lachelli were indicted on the same day as Abroms. That case was pending before a different district judge, but involved the same tapes as in Abroms'. Therefore, the district judge before whom Abroms' case was pending consolidated it with that of Tomblin, Mauldin, and Lachelli for a suppression hearing before the other district judge. However, when Tomblin, Mauldin, and Lachelli obtained a continuance, the district judge in Abroms' case held the suppression hearing for Abroms and ruled the tapes admissible.

obliged to meet."), *cert. denied*, 349 U.S. 946, 75 S.Ct. 875, 99 L.Ed. 1272 (1955).

### III.

Accordingly, the judgment is
AFFIRMED.